907 A.2d 175

**Kenneth D. SCHISLER, et al.**

v.

**STATE of Maryland.**

**No. 140 Sept. Term, 2005.**

Court of Appeals of Maryland.

Sept. 14, 2006.

520

Andrew Radding and Gregory M. Kline H. Scott Jones of Adelberg, Budow, Dorf & Hendler, L.L.C., Baltimore, MD, David R. Thompson and Brynja M. Booth of Cowdrey, Thompson & Karsten, P.C., Easton, MD, on brief, for Appellants.

Michael D. Berman, Deputy Chief of Civil Litigation (J. Joseph Curran, Jr., Attorney General of Maryland, William F. Brockman and Cynthia G. Peltzman, Assistant Attorneys General, and Carl N. Zacarias, Staff Attorney, Baltimore, MD), on brief, for Appellee.

Argued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

This case arises from the denial by the Circuit Court for Baltimore City of a motion for a temporary restraining order and preliminary injunction. On June 14, 2006, the General Assembly convened in a Special Session to consider and pass Senate Bill 1. On June 22, 2006, Governor Robert L. Ehrlich, Jr. vetoed the Bill. On June 23, 2006, the General Assembly resumed its Special Session and voted to override the Governor's veto. Thus, Senate Bill 1 was enacted on June 23, 2006, upon veto override, as an "emergency bill" and was to take effect immediately.[1] Appellant, Kenneth D. Schisler, individually, as Chairman of the Public Service Commission and purportedly on behalf of those members of the PSC similarly

---

1. Pursuant to the Maryland Constitution, Article II, § 17(d): "If the Bill is an emergency measure, it shall take effect when enacted."

situated ("Commissioners"), and the Public Service Commission of Maryland ("PSC") (collectively the "Commission"), on June 26, 2006, filed a Complaint for a Declaratory Judgment and Temporary Restraining Order and Preliminary Injunction in the Circuit Court for Baltimore City.[2] Appellant sought to stay Sections 12 and 22 of Senate Bill 1—which terminated the Commissioners' appointments—from taking effect. On June 28, 2006, the Circuit Court denied relief to appellant. On June 29, 2006, appellant noted an appeal to this Court.

The appellant presents one question for our review:

"Did the Circuit Court of Baltimore City err by entering its June 28, 2006 order denying appellants' motion for a temporary restraining order?"

We hold that the Circuit Court for Baltimore City erred by denying appellant's complaint for a temporary restraining order. Sections 12 and parts of Section 22 of Senate Bill 1, as enacted by the General Assembly, are repugnant to the Maryland Constitution in that they permit the Legislative Branch of government to usurp the Executive's power to supervise the Executive Branch as set forth in Article II, § 1 of the Maryland Constitution,[3] usurps the power of the Governor to execute the laws as set forth in Article II, § 9 of the Maryland Constitution,[4] usurps the Executive's power to terminate officers of the Executive Branch as set forth in Article II, § 15 of the Maryland Constitution[5] and is otherwise in violation of Section 8 of the Declaration of Rights of Maryland. There-

---

**2.** Schisler's authority to act in behalf of other members of the Commission, or the Commission itself, is not clear, but it is not an issue we need address. We shall regard Schisler as appellant.

**3.** "The executive power of the State shall be vested in the Governor. . . ."

**4.** "He [the Governor] shall take care that the Laws are faithfully executed."

**5.** "The Governor . . . may remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years."

fore, we shall hold that Section 12 and parts (as hereafter discussed) of Section 22 of Senate Bill 1 are null and void.

## I. Facts

As stated, this case involves a challenge to the constitutionality of an Act of the General Assembly. On June 14, 2006, in response to an anticipated 72% increase in the cost of electricity by Baltimore Gas & Electric Company (BGE) facing a large number of Maryland citizens and in reaction to certain acts taken by the Public Service Commission, the General Assembly convened a Special Session and passed Senate Bill 1 as emergency legislation.[6] Governor Robert L. Ehrlich, Jr. vetoed the legislation and on June 23, 2006, the veto was overridden by more than a three-fifths majority of both the House of Delegates and the Senate. Senate Bill 1 was to become immediately effective pursuant to Article II, § 17(d) of the Maryland Constitution.

Senate Bill 1 makes various changes to the Public Utilities Article.[7] These changes ostensibly reconstitute the PSC, pro-

---

**6.** It should be noted, in order to place the situation extant in the case *sub judice* in historical perspective, that this massive rate hike in energy prices emanates from the State of Maryland's deregulation of the energy industry in 1999. The Electric Customer Choice and Competition Act of 1999 was enacted by the General Assembly and signed into law by the Governor in office at that time. The Legislature, however, limited the deregulation by statutorily and artificially imposing caps on rate increases. *See* Chapter 3 of the Acts of 1999. The rate caps put into place in 1999 expired in 2006, causing Maryland's artificially low energy prices to increase dramatically. For a relatively recent discussion of the history and background of the regulation of utility companies and their regulation in Maryland, see *Delmarva Power & Light Co. v. Public Service Commission*, 370 Md. 1, 5–10, 803 A.2d 460, 462–65, *aff'd on reh'g*, 371 Md. 356, 809 A.2d 640 (2002).

**7.** Senate Bill 1 stated:
 "BY repealing and reenacting, with amendments,
  Article–Public Utility Companies
  Section 2–102, 2–202(a) and (b), 5–203, 6–101 through 6–103, 7–510(c), and 7–512.1(a), (b), and (e)
  Annotated Code of Maryland
  (1998 Volume and 2005 Supplement)
 BY repealing and reenacting, without amendments,
  Article–Public Utility Companies

vide current rate relief and establish processes by which rate increases may be studied.

The PSC is a statutorily created independent unit in the Executive Branch of State government. Md.Code (1998), § 2–101 of the Public Utility Companies Article ("PUC").[8] PUC § 2–101 was not affected by the enactment of Senate Bill 1. Appellant challenges two provisions of Senate Bill 1, which directly affect the terms of office of the current Commissioners and the future appointment of interim Commissioners to the PSC—sections 12 and 22.[9] PUC § 2–102, prior to the

----

> Section 2–103, 2–113, and 5–104
> Annotated Code of Maryland
> (1998 Volume and 2005 Supplement)
> BY adding to
> Article–Public Utility Companies
> Section 2–202(g), 6–105, and 7–513(f); 7–520 through 7–544, inclusive, to be under the new part 'Part III. Rate Stabilization–In General'; and 7–547 through 7–549, inclusive, to be under the new part 'Part IV. Rate Stabilization–Special Provisions'
> Annotated Code of Maryland
> (1998 Volume and 2005 Supplement)"

8.  Which provides:

> " § **2–101. Established; purpose.**
> (a) *Established.*—There is a Public Service Commission.
> (b) *Independent unit.*—The Commission is an independent unit in the Executive Branch of State government.
> (c) *Purpose.*—The Commission shall carry out the functions assigned to it by law."

9.  Section 12 of Senate Bill 1 states:

> "SECTION 12. AND BE IT FURTHER ENACTED, That, notwithstanding the provisions of § 2–102 of the Public Utility Companies Article, as enacted by this Act, except for subsection (d)(3), and notwithstanding the provision of § 2–103 of the Public Utility Companies Article, as enacted by this Act, except for subsection (b)(2):
> (1) the term of office of the chairman and each commissioner of the Public Service Commission serving on the effective date of this Act shall terminate at the end of June 30, 2006;
> (2) on or before July 1, 2006, the President of the Senate of Maryland and the Speaker of the House of Delegates shall present:
> (i) a list, containing at least three names, from which the Governor shall select a new Chairman of the Public Service Commission in accordance with this Act;

enactment of Senate Bill 1, set out the membership provisions for the Commission. PUC § 2–102 provided for five commissioners, appointed by the Governor with the advice and consent of the Senate to five year, staggered terms, beginning on July 1 of the year in which they are appointed.[10]   PUC § 2–

(ii) a second list, containing at least ten names, from which the Governor shall select four other new commissioners of the Public Service Commission in accordance with this Act;

(3) if the Governor fails to appoint five members to the Public Service Commission by July 15, 2006:

(i) the President and the Speaker promptly shall appoint the members needed to complete the Commission's fully authorized membership *and designate the Chairman;* and

(ii) the Executive Secretary of the Public Service Commission shall be authorized to act on behalf of the Commission in carrying out ministerial functions until the fully authorized membership has been appointed;

(4) the members of the Commission appointed under this section do not require confirmation by the Senate;

(5) a name may appear on both lists under item (2) of this section; and

(6) the terms of office of the members of the Public Service Commission appointed under this section shall expire as follows:

(i) one commissioner at the end of June 30, 2007;

(ii) one commissioner at the end of June 30, 2008;

(iii) the Chairman at the end of June 30, 2009;

(iv) one commissioner at the end of June 30, 2010; and

(v) one commissioner at the end of June 30, 2011."

Section 22   of Senate Bill 1 states:

"SECTION 22.   AND BE IT FURTHER ENACTED, That:

(a) If any provision of this Act or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this Act which can be given effect without the invalid provision or application, and for this purpose the provisions of the Act are declared severable.

(b) If § 12(1) of this Act is held invalid, then the term of the Chairman and each member of the Public Service Commission is eliminated and these public officers serve at the pleasure of the Attorney General, who is authorized to terminate their service and appoint their successors.

(c) If § 12(2) and (3) of this Act are held invalid, then the Attorney General shall appoint the Chairman and each member of the Public Service Commission in accordance with the remaining provisions of § 12 of his Act."

10. PUC § 2–102, as amended by Senate Bill 1, states that after the present members' commissions are vacated:

103 provides for the designation of a Chairman of the PSC from among the commissioners. The Governor designates the Chairman with the advice and consent of the Senate and the Chairman serves a five year term beginning on July 1 of the year appointed.[11] Prior to the enactment of Senate Bill 1, the Governor appointed the Commissioners and designated the

"(a) The Commission consists of five commissioners, appointed by the Governor with the advice and consent of the Senate.
(b) (1) Each commissioner shall be a registered voter of the State.
(2) The Commission shall be:
(I) broadly representative of THE GEOGRAPHIC AND DEMO-GRAPHIC DIVERSITY OF THE STATE AND OF the public [interest]; and [shall be]
(II) composed of individuals with diverse training and experience.
(c) Each commissioner shall devote full time to the duties of office.
(d) (1) The term of a commissioner is 5 years and begins on July 1.
(2) The terms of commissioners are staggered as required by the terms in effect for commissioners on [October 1, 1998] JULY 1, 2006.
(3) At the end of a term, a commissioner continues to serve until a successor qualifies.
(4) A commissioner who is appointed after a term has begun serves for the rest of the term and until a successor qualifies.
(e) Before taking office, each appointee to the Commission shall take the oath required by Article I, § 9 of the Maryland Constitution.
(f) The Governor may remove a commissioner for incompetence or misconduct in accordance with § 3–307 of the State Government Article."
Thus, the statute remains the same (as to appointments, terminations, etc.), except the current members are terminated and the present Governor (and apparently only him, i.e., no later Governors were subjected to it) must use the new and temporary appointment process. The only other change being the addition of the language in (b)(2)(I): "THE GEOGRAPHIC AND DEMOGRAPHIC DIVERSITY OF THE STATE AND OF[,]" which does not substantially change the appointment process.

11. Maryland Code (1998, 2005 Supp.), § 2–103 of the Public Utility Companies Article was repealed and reenacted without any amendment by Senate Bill 1 and states:
" § 2–103. Chairman.
(a) *Appointment.*—With the advice and consent of the Senate, the Governor shall appoint a Chairman.
(b) *Term.*—(1) The term of the Chairman is 5 years and begins on July 1.
(2) At the end of a term, the Chairman continues to serve until a successor qualifies.
(3) A Chairman who is appointed after a term has begun serves for the rest of the term and until a successor qualifies."

Chairman, subject to Senate confirmation, without being restricted to a list from the President of the Senate of Maryland and the Speaker of the House of Delegates.

All four incumbent Commissioners [12] were duly appointed by the Governor and confirmed by the Senate. Therefore, they are civil officers of the State serving various staggered terms of years. Section 12 of Senate Bill 1 attempts to terminate the positions of the Chairman and the Commissioners as of June 30, 2006. At present, they are in place pursuant to a stay granted by this Court, pending a final resolution of the issues in the case at bar.

Appellant contended below that Sections 12 and 22 of Senate Bill 1 violate Article II, § 15 of the Maryland Constitution; [13] Article 24 of the Maryland Declaration of Rights; [14] Article I, § 10 of the U.S. Constitution; [15] and Maryland Code (1984, 2004 Repl.Vol.) § 3–307 of the State Government Article. [16] The Circuit Court heard the case on June 27, 2006, and,

---

12. The incumbent Commissioners are as follows: Chairman, Kenneth D. Schisler, Harold D. Williams, Allen M. Freifeld, and Chuck Boutin. Commissioner Karen Smith resigned her position on June 29, 2006. Commissioner Harold Williams informed appellant's counsel that he did not want to participate in the case *sub judice.*

13. Article II, § 15 of the Maryland Constitution states:

"The Governor may suspend or arrest any military officer of the State for disobedience of orders, or other military offense; and may remove him in pursuance of the sentence of a Court–Martial; and *may remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years.*" (Emphasis added.)

14. Article 24 of the Maryland Declaration of rights states:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

15. Article I, § 10 of the U.S. Constitution, in relevant part, states: "No State shall . . . pass any Bill of Attainder. . . ."

16. Maryland Code (1984, 2004 Repl.Vol.), § 3–307 of the State Government Article states in pertinent part:

as we indicated earlier, issued a written order on June 28, 2006, denying appellant's motion for a temporary restraining order. The trial court stated:

"At this juncture, the Court believes that [appellant has] not demonstrated a likelihood of success on the merits. The General Assembly's authority to alter the terms of office of the Public Service Commissioners and to reconstitute the Commission with new appointees, chosen by the Governor from lists submitted by the legislative leaders, is not beyond its constitutional authority and does not run afoul of the federal constitution's dictates on separation of powers or bills of attainder. Nor does it violate Maryland law. *See [Mayor of] Baltimore v. State*, 15 Md. 376 (1860); *Anderson v. Baker*, 23 Md. 531, 627 (1865); *Davis v. State*, 7 Md. 151, 161 (1854); *Little v. Schul*, 118 Md. 454, 563–64[463–64], [84 A. 649] (1912); *Town of Glenarden v. Bromery*, 257 Md. 19, 27 [262 A.2d 60] (1970); and the statutory appointment process examples cited by defendant at pages 13–14 of its memorandum in opposition to the motion." [Footnote omitted.]

On June 29, 2006, pursuant to Section 19 of Senate Bill 1, *supra*, appellant filed a notice of appeal with this Court. The case was immediately set for oral argument which was held eight days later on July 7, 2006. Upon conclusion of the arguments we stayed certain of the provisions of Senate Bill 1 with an order noting that an opinion would follow.

---

"(a) *Governor's authority—Investigation of complaint.*—On the filing of a complaint against a civil or military officer who may be suspended or removed from office by the Governor, the Governor:

   (1) shall provide to the respondent:

   (i) a copy of the complaint; and

   (ii) notice of the time when the Governor shall hear the complaint;

   (2) may summon any witness to testify concerning the complaint, pay the witness a fee of $1 a day for attending, and reimburse the witness for travel expenses incurred in testifying;

   (3) may designate one or more individuals to attend on the Governor's behalf any part of the hearing that relates to the establishment of the facts of the complaint; and

   (4) may order either party or the State to pay any costs of the proceeding."

At oral argument the position of the Legislature was clearly presented during the following exchange between the Court and the State:

The Court: The Court of Special Appeals is authorized by the Constitution but not protected by it.

The State: Yes, your Honor.

The Court: ... With the reasoning ... that the State ascribes in this case to an Executive Branch agency, how would it differ? Does the General Assembly have the power if it doesn't like the decision of a three judge panel on the Court of Special Appeals to pass a statute abolishing the Court of Special Appeals and immediately pass a new statute recreating the Court of Special Appeals causing the appointment process to be such that those three judges get kicked off the Court of Special Appeals?

. . .

The State: ... focusing purely on legislative power, I think that there is a colorable argument that, unpalatable as it may be, that the Legislature would have that power and that the remedy would be for the voters in the following November to exercise their power and say they disagreed with the Legislature.[17]

. . .

The Court: ... Could they [the Legislature] in one bill have terminated the terms of every officer appointed by the Governor other than ones whose terms are provided for in the Constitution?

---

17. Article IV, § 5A of the Maryland Constitution provides for ten year terms upon a retention election by the voters, thus the Constitution provides for the terms of the judges of the Courts of Appeal. Art. IV, §§ 5A(c) (Court of Appeals) and (d) (Court of Special Appeals). Other provisions of the Constitution provide for the removal of judges. In light of the constitutional provisions, the position taken by the State at oral argument appears not to be as colorable as it was represented to be.

. . .

The State: Correct. I would have to answer your Honor's question, yes. The Legislature does have that power, wise or unwise, reasonable or unreasonable.

. . .

The Court: What happens to the separation of powers under Article 8? If they could do that?

The State: ... I would say in response to your Honor's question as a matter of pure State Constitutional Law, yes, unpalatable as it may be, the Legislature could do that. The remedy would be in November when the voters express their will.... [T]he powers of the Legislature preceded the Constitution. The Constitution simply directs that they exercise those powers.... [P]ower resides in the people, but in a democracy that power is given to the Legislature and the Legislature has that full power, the wisdom of their exercise of the power, respectfully, is not a matter for the Judiciary. If they have that power they may exercise it.

. . .

The Court: ... [B]ut your argument is that the power of removal of the General Assembly is virtually unlimited. [It may] remove anybody....

The State: That is correct. Any statutory officer that it created, it could not remove the Governor or the Attorney General, they are constitutional officers.

. . .

The Court: Well, if the General Assembly has all the power, ... what do we need the Executive for?

. . .

The Court: ... [H]iring and firing of Executive Branch employees appears to be an executive function.

The State: Not necessarily your Honor, the Legislature could not budget money for employees. Under our Constitution the Legislature can reduce salaries.

. . .

The Court: In this case they didn't do it by way of the budget.

The State: That is correct. They did not. However, the plenary power of the Legislature, absent a limitation is near absolute.[18]

The Court: [Isn't the] provision in the Constitution reserving Executive power to the Executive a limitation in the Constitution on the ability of the Legislative Branch to interfere with the Executive functions? . . . .

---

**18.** In respect to a similar argument in reference to the implied separation of powers doctrine in the Federal Constitution, the Supreme Court of the United States in *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), noted what is an obvious inference from the State's argument. If the Legislature claims the right to fire Executive Branch (or Judicial Branch) officers or employees at will, it would have the power to control, if not eliminate, the other branches of government. In *Bowsher*, the Supreme Court realized that by placing the responsibility for conducting Executive agency actions in the hands of an official who Congress had the power to terminate, Congress was asserting "control over the execution of the Act and has intruded into the executive function. The Constitution does not permit such intrusion." *Id.* at 734, 478 U.S. 714, 106 S.Ct. at 3192, 92 L.Ed.2d 583.

Senate Bill 1 provides that, under some circumstances, the Attorney General can terminate the current members of the Commission. So long as the Commission is part of the Executive Branch of government, the Legislature cannot delegate to the Attorney General the power to fire Executive Branch employees. Accordingly, while, as we discuss later, the Legislature can delegate (or retain) the power of appointment of certain Executive Branch officers, it cannot delegate the power of termination because it does not have that power to delegate.

Additionally, as we note later, early use of the term "plenary" power as it relates to the Legislature, was limited to its power to *pass* legislation, i.e., it is the only branch of government that passes legislation. The term has never been construed to hold that the Legislature may ignore constitutional limitations when it enacts legislation. *See*, footnote 52 and *Brawner v. Supervisor*, 141 Md. 586, 602, 119 A. 250, 255 (1922).

. . .

The State: ... in *Glenarden* what was at issue was a change in an organic statute that appointed the officials. And what we have here is a change in an organic statute.

. . .

The Court: [When you] talk about organic law [in *Glenarden* ] you're talking about the charter; the equivalent in this situation would be to change the Maryland State Constitution which the General Assembly did not do.

. . .

The State:.... If we go back and we look at the legislative history for this bill, the statement of the "Democracy for Baltimore" group said there are some good provisions in this Bill, especially replacement of the Public Service Commission, which in its current form appears to be acting against the public interest, not for it. Three County Executives, County Executives Owens, Roby, and Smith wrote: The PSC quote seriously mishandled its responsibilities respecting BGE's requested rate increase and, I think they mean in admission, and its admission of procedural flaws and violations of the statutory provisions applicable to matters before the PSC.

So there was a lot before the Legislature to deal with....

. . .

The State: ... So, I think the answer to your Honor's question is based on the record that is before us. The General Assembly was addressing a problem, and if the problem required terminating, shortening, ending the terms of the current Commissioners, they obviously intended to do that.

## II. Standard of Review

■    Maryland Rule 15–504(a) governs temporary restraining orders and states that:

"A temporary restraining order may be granted only if it clearly appears from specific facts shown by affidavit or other statement under oath that immediate, substantial, and irreparable harm will result to the person seeking the order before a full adversary hearing can be held on the propriety of a preliminary or final injunction."

There are four factors that a court must find to exist before it may issue an interlocutory injunction. *Dep't of Transp. v. Armacost*, 299 Md. 392, 404–05, 474 A.2d 191, 197 (1984). The Court, in *Armacost*, enumerated these factors as follows:

"As a general rule, the appropriateness of granting an interlocutory injunction is determined by examining four factors: (1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest."

*Id.* (citing *State Dep't of Health and Mental Hygiene v. Balt. County*, 281 Md. 548, 554–57, 383 A.2d 51, 55 (1977)) (footnote omitted); *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 455–56, 654 A.2d 449, 456 (1995).

Our review of a trial court's determination to grant or deny a temporary restraining order is, generally, subject to an abuse of discretion standard. As we stated in *State Commission on Human Relations v. Talbot County Detention Center*, 370 Md. 115, 803 A.2d 527 (2002):

"Generally, appellate courts review a trial court's determination to grant or deny injunctive relief for an abuse of discretion because trial courts, sitting as courts of equity, are granted broad discretionary authority to issue equitable relief. *See J.L. Matthews, Inc. v. Maryland–National Capital Park & Planning Comm.*, 368 Md. 71, 93, 792 A.2d 288, 301 (2002). *See El Bey v. Moorish Sci. Temple of Am.*, 362 Md. 339, 354–55, 765 A.2d 132, 140 (2001) (stating that while normally a trial court's decision to grant or deny injunctive relief is reviewed for an abuse of discretion, 'no such defer-

ence [is given] when we find "an obvious error in the application of the principles of equity" ') (quoting *Western Md. Dairy, Inc. v. Chenowith*, 180 Md. 236, 244, 23 A.2d 660, 665 (1942)); *Colandrea v. Wilde Lake Community Ass'n Inc.*, 361 Md. 371, 394, 761 A.2d 899, 911 (2000)."

*Id.* at 127, 803 A.2d at 534. And, " 'even with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards.' " *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 301, 849 A.2d 451, 459 (2004) (quoting *Alston v. Alston*, 331 Md. 496, 504, 629 A.2d 70, 74 (1993)). Therefore, while the trial court is granted broad discretion in granting or denying equitable relief, where an order involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are "legally correct" under a *de novo* standard of review. *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 383, 897 A.2d 206, 211 (2006); *Gray v. State*, 388 Md. 366, 374–75, 879 A.2d 1064, 1068 (2005); *Nesbit v. GEICO*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004); *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609, 612 (2002).

As the question before the Court involves the interpretation and application of Maryland constitutional, statutory and case law, we shall review the case *sub judice* under a *de novo* standard of review.

■ Judge Battaglia, in her dissent, suggests that an immediate appeal does not lie from the grant, denial, or dissolution of a temporary restraining order (TRO). She is incorrect. Maryland Code, § 12–303(3)(i) and (iii) permits an immediate appeal from an order "[g]ranting or dissolving an injunction" or "[r]efusing to grant an injunction." Irrespective of how the Federal courts may construe a TRO for purposes of Federal practice and procedure, a TRO is clearly in the nature of an injunction under Maryland law. Maryland Rule 15–501(c), which is part of the Rules adopted by this Court dealing with injunctions, defines a "temporary restraining order" as "an injunction granted without opportunity for a full adversary

hearing on the propriety of its issuance." This Court has thus expressly defined a TRO as an injunction.

Section 12–303 of the Courts Article does not distinguish between the types of injunctions, the grant, dissolution, or denial of which are immediately appealable. It does not say that an appeal may be taken only from an order granting, denying, or dissolving a permanent or temporary injunction, but allows interlocutory appeals from such orders involving *any* injunction. Nor can we find any principled basis for disallowing immediate appeals from orders granting, dissolving, or denying a TRO. Indeed, given the fact that TROs are entered or denied without any hearing in the Circuit Court, there is greater reason to allow immediate appellate review of those orders than of injunctions entered after a hearing.

### III. Discussion

### A. History

### 1. The Public Service Commission

In 1910, the Legislature initiated the regulation of public service companies, i.e., utilities. *Delmarva Power & Light Co.*, 370 Md. at 7, 803 A.2d at 463 (describing the origins of public utility regulation and the birth of the Public Service Commission). This regulation was to be administered by the Public Service Commission and was enacted as Chapter 180 of the Acts of 1910, which provided in pertinent part:

> "SECTION 1. *Be it enacted by the General Assembly of Maryland,* That this Act shall be known as the 'Public Service Commission Law,' and shall apply to the public services herein described and to the Commission hereby created and to the public service corporations and persons herein mentioned and referred to."

The services that were to be regulated included: railroads; common carriers; "the manufacture, sale or distribution of gas, natural and artificial, and electricity for light, heat and power[;]" all telephone and telegraph lines; water companies; anyone person or company engaged in the transportation of property or freight. Chapter 180, § 3 of the Acts of 1910.

At that time, the Legislature gave the Governor control over the PSC. The Public Service Commission Law was subsequently codified in Article 23, §§ 413–468 of the Public and Local Laws of the Maryland Code of 1911. The law was subsequently re-codified as Article 78, §§ 1–88 of the Maryland Code of 1951.

The Legislature later reset the terms of commissioners in Chapter 474, § 1 of the Acts of 1949, which stated:

> "Upon June 1st, 1949, all of the terms of the Commissioners in office shall terminate and the Governor shall thereupon appoint one member for a term of two years, one for a term of four years, and one for a term of six years, and thereafter the term of office of each Commissioner shall be for six years from the time of his appointment and qualification and until his successor is duly appointed and shall qualify."

Two commissioners had been appointed in 1948, John H. Hessey and Frank Harper. They both remained on the Commission until 1954 and 1956 respectively. After serving a full term, Arthur H. Brice was replaced by Olin R. Higgins in 1948. Mr. Higgins remained in office until 1950 when he was replaced by Wilmer Fell Davis in 1951. As a result, it is apparent that the Governor, in 1949, reappointed the incumbent commissioners to their respective posts upon the passage of the bill.[19] Perhaps, for that reason, no challenge to that enactment was made in the courts.

The next major revision was enacted in Chapter 441 of the Acts of 1955. The Act provided the following:

*"Commissioners*

*5. (Membership of Commission.)*

---

19. The terms of the commissioners were obtained from Janice A. Beecher, Ph.D., The All Commissioners List, Institute of Public Utilities at Michigan State University (24 June 2006), *available at* http://www.ipu.msu.edu/Research/documents/Research-Beecher-All% 20Commissioner–Listing–06.pdf (last visited July 31,2006).

*The commission shall consist of three commissioners, appointed by the Governor. Each commissioner must be at least 25 years of age, must be a registered voter resident in Maryland when he is appointed and when he qualifies, and must have been a resident of Maryland for at least five years next preceding his appointment. The Governor shall designate one of the commissioners as chairman, and the chairman shall serve in that capacity until expiration of his term as commissioner. Commissioners shall be eligible for reappointment.*"

*Id.* The new statute also changed the removal procedures set forth in the prior statute:

"*8. (Removal.)*

*The Governor may remove any commissioner for incompetency or misconduct in office, in accordance with the procedure set forth in Article 41, sections 53–55.*"

*Id.* This requirement made the removal language similar to that of Article II, § 15 of the Maryland Constitution. After this change there were several significant changes, unrelated however, to the issue of terminating commissioners. *See* Chapter 516 of the Acts of 1972; Chapter 652 of the Acts of 1975; and Chapter 756, § 1 of the Acts of 1976.

In 1976, for a second time in the history of the Commission, the Legislature reset the clock on the commissioners' terms, providing:

"(B) THE TERMS OF EACH COMMISSIONER APPOINTED HEREUNDER SHALL COMMENCE ON JULY 1, 1976. WITH RESPECT TO THE INITIAL APPOINTMENTS ONLY, THE TERM OF ONE COMMISSIONER *(WHO SHALL BE FULLTIME)* SHALL EXPIRE ON JUNE 30, 1978, THE TERM OF THE SECOND COMMISSIONER SHALL EXPIRE ON JUNE 30, 1979, THE TERM OF THE THIRD COMMISSIONER *(WHO SHALL BE FULL TIME)* SHALL EXPIRE ON JUNE 30, 1980, THE TERM OF THE FOURTH COMMISSIONER SHALL EXPIRE ON JUNE 30, 1981, AND

THE TERM OF THE CHAIRMAN *(WHO SHALL BE FULLTIME)* SHALL EXPIRE ON JUNE 30, 1982."

Chapter 756, § 2 of the Acts of 1976. Like the 1949 amendment, this section also resets the terms of the commissioners. The incumbents, however, were apparently considered for reappointment to the Commission by the Governor. After the 1976 bill was passed, two of the incumbents remained in office, Michael Darr Barnes and William S. Baldwin. Apparently, there was one vacancy on the Commission as M. Bayne Brooke and Robert L. Sullivan, Jr., had left in 1975. Once again, the sitting commissioner were not terminated as a result of the legislation. There appears to have been no challenge made in the courts to the enactment of this legislation.

In 1980, the Legislature made the residency requirement mandatory once again, provided that all five commissioners must be employed full time on the Commission, and repealed the 1976 provision, replacing it with the following:

"SECTION 2. AND BE IT FURTHER ENACTED, That members of the Commission as of June 30, 1980 *shall continue to serve the terms under which they were appointed.* Provided however, the term of the commissioner appointed to a term commencing July 1, 1980 shall expire on June 30, ~~1983.~~ *1986, the term of the Commissioner appointed to a term commencing on July 1, 1981 shall expire on June 30, 1987 and the term of the commissioner appointed to a term commencing on July 1, 1982 shall expire on June 30, 1988.* Thereafter, members of the Commission appointed or reappointed to fill expired terms shall be appointed to serve 5–year terms. Thus, the terms are as follows:

July 1, 1980 to June 30, ~~1983~~ *1986;*

July 1, 1981 to June 30, ~~1986~~ *1987;*

July 1, 1982 to June 30, ~~1987~~ *1988;*

~~July 1, 1983 to June 30, 1988;~~

July 1, 1984 to June 30, 1989; ~~and~~

July 1, 1985 to June 30, 1990~~.~~*;*

*July 1, 1986 to June 30, 1991;*

*July 1, 1987 to June 30, 1992;*
*July 1, 1988 to June 30, 1993."*

Chapter 729 of the Acts of 1980 (emphasis added). As the text of the Act expressly states, the Legislature determined that the sitting commissioners were to remain in their positions as the new terms were phased in. In actuality, the terms the sitting commissioners were then serving were extended, not shortened or terminated as in the present case. For obvious reasons, there was no challenge made in the courts to this legislation.

In 1998, the next major reenactment of the Public Service Commission Law took place. Chapter 8 of the Acts of 1998. The Act repealed Article 78 and created the Public Utilities Article. The new enactment, among other things, expressly provided in section 2–101(B) that "THE COMMISSION IS AN INDEPENDENT UNIT IN THE EXECUTIVE BRANCH OF STATE GOVERNMENT." Chapter 8, § 2 of the Acts of 1998. In subsection "2–102(F) REMOVAL" it also provided that "THE GOVERNOR MAY REMOVE A COMMISSIONER FOR INCOMPETENCE OR MISCONDUCT IN ACCORDANCE WITH ARTICLE 41, §§ 2–501 THROUGH 2–504 OF THE CODE." [20] *Id.* With respect to the

---

**20.** The Public Service Commission also has the statutory power and duty to set the rates public service companies charge their Maryland customers: "The Commission shall have the power to set a *just and reasonable rate* of a public service company, as a maximum rate, minimum rate, or both." PUC § 4–102(b) (emphasis added). The code also provides:

"In this title, 'just and reasonable rate' means a rate that:
 (1) does not violate any provision of this article;
 (2) fully considers and is consistent with the public good; and
 (3) except for rates of a common carrier, *will result in an operating income to the public service company that yields, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return on the fair value of the public service company's property used and useful in providing service to the public."*
PUC § 4–101 (emphasis added). The statute expressly states that the Public Service Commission should take into consideration a reasonable rate of return for the utilities that it regulates. This type of regulation embodies the common sense requirement that utilities be allowed to have a reasonable return on their investment in providing services for

removal section, the Revisor's note states: "As to subsection (f) of this section, for other provisions on removal, *see:* Md. Constitution, Art. XV, § 2, on suspension and removal for crimes, and SG § 8–501, on removal for failure to attend meetings." *Id.* This re-codification of the Public Service Commission Law, did not involve any substantial changes to the composition of the Commission. It did, however, underscore the fact that the PSC was an independent unit of the Executive Branch and acknowledged the Governor's power to remove a commissioner where incompetence or misconduct are alleged to exist.

It is clear that in respect to all previous modifications of the appointment process for Public Service Commission members, the changes in term were prospective and the terms were extended, or that the incumbents were immediately re-appointed, and/or that no one challenged the respective modifying statutes. The issue now before us appears to be an issue of first impression in this State.

### 2. Senate Bill 1

Senate Bill 1 and the proceedings during which it was enacted, make clear that the primary focus of the Bill was to remove members of the Public Service Commission, whose decisions the Legislature, or some members of the Legislature, opposed.

The situation arose from legislation enacted by the General Assembly in 1999 that partially deregulated the electricity industry in Maryland. The General Assembly concluded that, by allowing electricity rates to be governed by market forces rather than through the "guarded monopoly" approach that had served the State so well for more than 80 years, competition would keep rates at a reasonable level and promote efficiency and better service. *See Delmarva Power v. P.S.C.,* 370 Md. 1, 803 A.2d 460 (2002). Recognizing that it would take some time for the anticipated competition to take hold,

---

the public, otherwise companies would be reluctant to provide services at all and the public interest would be severely affected.

however, and unwilling to allow rates to float unregulated in the interim, the Legislature required that rates be "capped" at their then-current level until July 1, 2006, after which that part of the rates based on the cost of generating and transmitting electricity would become unregulated by the PSC. When the "caps" were about to expire, however, it was clear that the anticipated competition, upon which the Legislature relied, had not occurred, and some of the utilities that had spun off their generating facilities and would be forced to purchase electricity in the open market, announced that, effective July 1, 2006, electricity rates would increase significantly, in the case of BGE, by 72%. All that followed came from the efforts of various instruments of the government, including the Governor, County Executives, Mayors, members of the General Assembly, and others, to influence the issue of rate increases.[21] Ultimately, certain of the entities actively involved in the process disagreed with the actions of the Public Service Commission. Senate Bill 1 resulted.

Section 12 of Senate Bill 1, in relevant part, provides as follows:

---

21. There was also an issue of the merger (or consolidation or sale) of a major local utility in Senate Bill 1. It provided, in essence, that until the current Commissioners are replaced pursuant to Sections 12 and 22, the Commissioners may not take final action on that issue. That provision, however, was not among the issues presented to this Court for resolution. Accordingly, we do not directly address it, although we acknowledge that our decision on the issue of Sections 12 and 22 impacts that section (Section 5 of Senate Bill 1). With our decision that Sections 12 and parts of Section 22 are unconstitutional, no Commissioners will be replaced pursuant to Sections 12 and 22 of Senate Bill 1. Presumably the Legislature understood this situation, because it included a severability clause in the Bill and additionally attempted to make specific provisions that would take place in the event that Sections 12 and 22 were declared invalid. By not making any similar specific provisions in respect to Section 5, it presumably intended that if the then Commissioners were not replaced, no final action on such a merger could take place. No separate constitutional challenge is now before the Court in respect to Section 5. Accordingly, we do not address the appropriateness of the Legislature creating an independent agency within the Executive Branch of government, then via subsequent legislation telling it what to do *in specific cases* (as opposed to setting standards generally).

"(1) the term of office of the chairman and each commissioner of the Public Service Commission serving on the effective date of this Act shall terminate at the end of June 30, 2006 . . . ."

Other provisions in that section provided that the replacements of the Commissioners were to be selected in the following manner: (1) The President of the Senate of Maryland and the Speaker of the House of Delegates were to present lists of names to the Governor from which he was required to select a new chairman and the new members of the Public Service Commission, and (2) if the Governor failed to make such appointments by a specified date, the President and the Speaker were authorized to make the appointments.

Senate Bill 1, in anticipation that some part of the Act might be found to be unconstitutional, provided in Section 22 that the invalidity of any section of the Act was not to affect the validity of the balance of the Act. It expressly provided that the respective sections were to be considered "severable." It then provided specifically for what was to occur if Section 12(1) was to be declared invalid:

"(b) If Section 12(1) of this Act is held invalid, then the term of the Chairman and each member of the Public Service Commission is eliminated [22] and these public officers serve at the pleasure of the Attorney General,[23] who is authorized to terminate their service and appoint their successors."

Senate Bill 1, § 22(b) goes on to provide that if sub-sections 12(2) and 12(3) (containing the provisions that authorize the President of the Senate and Speaker of the House to submit lists to the Governor and if he does not appoint from the lists, that the President and Speaker are authorized to appoint) are

---

**22.** It is not very clear how a "term" can be "eliminated."

**23.** It is not clear how persons whose "term" has been "eliminated" can continue to serve at anyone's pleasure.

held invalid, then the Attorney General is to appoint the members of the Commission and its Chairman.[24]

Contained in the bill file for Senate Bill 1 are several documents that shed light on what was occurring during the proceedings in reference to the Bill. One is an Attorney General's opinion that, as to the issues presented in this case, merely concludes that the Legislature can provide for appointments to the Commission in a mode different than having the Governor appoint and the Senate consent. Letter from J. Joseph Curran, Jr., Attorney General of Maryland, to Robert L. Ehrlich, Jr., Governor of Maryland (June 16, 2006). As we shall see later, with that proposition we agree. The Attorney General, however, did not address the determinative issue in the case: Whether the Legislature in the manner in which it was acting (and did act), was usurping the power granted to the Governor to remove officials appointed by him to a term of years for misconduct or incompetency or otherwise usurping the power of the Executive to supervise Executive Branch agencies.

The power of removal is granted to the Governor by the "organic" law of this State, pursuant to Article II, § 15 of the Maryland Constitution. The power to exercise supervision of Executive Branch agencies and to execute the laws are granted to the Governor by Article II, §§ 1 and 9 of the Maryland Constitution.

The *Fiscal and Policy Note—Revised,* of the Department of Legislative Services, provides, as relevant to the key issue we must resolve, that:

---

**24.** One of the primary issues in this case is whether the Legislature is usurping the power conferred on the Governor to remove (terminate) officers he has appointed for a term of years. If the Legislature is constitutionally prohibited from doing so, then it necessarily follows that it cannot delegate removal power to the Attorney General, absent a constitutional amendment. If, however, it does have such power, the Legislature, according to our cases, can confer that power on the Attorney General. Accordingly, we shall not separately address the powers conferred on the Attorney General as that issue will necessarily be addressed when we consider the power of the Legislature to remove these particular Commissioners.

*"The Bill:* ... The current terms of the PSC commissioners terminate on June 30, 2006. [It then describes the new temporary method of appointment of commissioners.] When the terms [of the interim members] expire, [future] members will be appointed by the Governor with the advice and consent of the Senate."

Accordingly, as the Department of Legislative Services perceived the Bill as first presented, and as it informed the members of the Legislature, this Bill, as to the appointment and removal of Commissioners, was to apply only to terminate the existing members of the Commission. The Bill then provided that at the next round of appointments of Commissioners the statute would automatically revert back to its prior configuration (as to the appointment of Commissioners) and whoever was Governor at that particular time would have the same duties and responsibilities the Governor had on January 1, 2006. In other words, the statute would, in essence, only apply to the present Governor. Pursuant to the language of Senate Bill 1, what that language provides and what it does not provide, whoever is Governor after the election of 2006, would, during his or her term have the same power to appoint the members of the Commission that existed prior to the passage of Senate Bill 1, automatically returned to him or her.

The report of the Senate Finance Committee on the Bill, as it related to the appointment and removal of Commissioners, stated:

"Replaces Public Service Commission (PSC) commissioners effective July 1, 2006.

. . .

"The term of office for the five commissioners serving as of June 30, 2006, ends June 30, 2006.

"The new term of all of the five commissioners begins July 1, 2006. Expiration of new terms is staggered beginning at the end of fiscal 2007.

*"For this time only,* a new chair and 4 other commissioners are appointed by the Governor from a list of 3 for the chair

and 10 names for the other commissioners provided by the presiding officers. (Future appointments are solely by the Governor with the consent of the Senate.) [25] The Governor has two weeks to make the new appointments; otherwise the Attorney General makes the appointments.[26] The Executive Secretary of the commission is authorized to carry out ministerial functions until the fully-authorized membership has been appointed. The new commissioner appointments do not need confirmation by the Senate."

The *Floor Report* of the Economic Matters Committee of the Maryland House of Delegates, provides in relevant part: *"The Bill:* ... The current terms of the PSC commissioners terminate on June 30, 2006.... The new commissioners have staggered five year terms with the new Chairman's term ending June 30, 2009. When the terms [of the interim members] expire, members will be appointed by the Governor with the advice and consent of the Senate."

Further review of the contents of the bill files indicate that three County Executives presented written testimony that, among other things, urged removal action by the Legislature:

**25.** Senate Bill 1 does not provide for a permanent change in the appointment process. Senate Bill 1 does not even change PUC § 2–102 of the code in respect to the appointment process. It merely replaces the current appointees of the present Governor (and perhaps his predecessor). But, when vacancies occur in the term of the appointees taking office under the new novel scheme of Senate Bill 1, the next Governor elected will be able to appoint in the traditional manner that it has always been done—appointment by the Governor with the advice and consent of the Senate. In other words, once this period of time (the terms of the specially appointed commissioners) has expired, the appointment process reverts back to what was in existence prior to Senate Bill 1.

**26.** The provision for direct appointment by the Attorney General, if the Governor did not appoint from the list, was apparently changed as the Bill, as passed, provides that the President and Speaker will make the appointments in such circumstance, except for the provision in Section 22 that if the sections that require the Governor to appoint from lists provided to him by the Senate President and Speaker of the House are declared invalid, the Attorney General has the power to appoint and terminate Commission members.

"Thus, we are joining with those many others who urge the Governor and Presiding Officers to call a Special Session as expeditiously as possible, and, at a minimum, to reconstitute the make-up of the Public Service Commission."

Written testimony from another County Executive, among other issues, related to the appointment process:

"I believe that there are several short and long term steps that must be taken . . .

First we must remove—and then reconstitute—the PSC and appoint real regulators who will be tasked with rebuilding a professional staff of experts committed to protecting the public interest—committed to the concept of a fair deal. . . ."

It appears clear to the Court that the purpose of Section 12 of Senate Bill 1 was to remove the current members of the Public Service Commission. As the State candidly conceded at oral argument ". . . they obviously intended to do that." Plainly and simply, it was an effort to remove the current members of the Commission. It simply cannot, with any degree of intellectual honesty, be argued that all the Legislature was doing was enacting a general restructuring of the statute or was, specifically, merely restructuring the Commission. The Legislature did what it said it was doing. It removed members of an administrative agency in the Executive Branch who had been lawfully appointed by a Governor for fixed terms. It fired them. Even then, it did so without any effort to apply, or even create any semblance of, due process standards. *See, infra, Cull v. Wheltle,* 114 Md. 58, 78 A. 820 (1910).

Judge Battaglia concludes in her dissent that the term "civil officer," as used in Article II, § 15 of the Maryland Constitution, does not include officers who are members of boards or commissions. We do not agree. Moreover, that is an issue that was not raised by the parties and none of the parties challenged the status of the Commissioners as "civil officers."

The wellspring of Judge Battaglia's notion is *School Com'rs v. Goldsborough,* 90 Md. 193, 44 A. 1055 (1899), which dealt only with whether the Governor was empowered by that section of the Constitution to discharge a member of a county school board and did *not* concern an attempt by the Legislature to terminate executive branch officers. The Court observed that the term "civil officer" also appeared in § 13 of Article II, which provided that the terms of all civil officers appointed by the Governor were to be two years, and concluded that the term must be given the same meaning and scope in both sections. Thus, according to the *Goldsborough* Court, a civil officer subject to gubernatorial discharge under § 15 must be a person who fell with the ambit of § 13.

*Goldsborough* was a particularly unusual case involving conflicts between sections of the Constitution as it then existed. These conflicts have since been removed by subsequent amendment. Even in 1899 the Court recognized the position in which the then existing conflicts placed the Court. It stated:

"Thus the alternative is presented of declaring the Act of 1892 unconstitutional, and striking down with it the present organization of the public school system, or of treating the school commissioners as not being civil officers within the meaning of sec. 15. *In the face of such an alternative* a strict rather than a liberal construction must be placed on sec. 15." (Emphasis added.)

*Id.* at 202, 44 A. 1055.

County school boards were a critical pillar in the State public education system, only recently created pursuant to Article VIII of the 1867 Constitution, and, in the statutes that created and governed that system, the terms of county school board members, who were appointed by the Governor, were set at six years. There was no suggestion that those persons were not officers in the general Constitutional sense, but if they were "civil officers" within the meaning of §§ 13 and 15, that statute would be unconstitutional, an effect of great and legitimate concern to the Court. In order to avoid that result,

the Court concluded that the term had to be construed much more narrowly than otherwise would be indicated, and so decided to limit to persons who exercised some part of the State sovereignty individually, by virtue of the office, and to exclude members of school boards, where the exercise of State sovereignty was committed to the corporate board rather than its individual members.

The *Goldsborough* case and the few that followed it were decided before the addition of Article XVII to the Constitution in 1922. Section 5 of that Article significantly limits Article II, § 13 by providing that all officers appointed by the Governor hold office for the terms fixed by law, which may be greater or lesser than two years. Section 9 of Article XVII provides that, in the event of a conflict between Article XVII and any other provision of the Constitution, Article XVII prevails. The conflict that lay at the heart of the *Goldsborough* decision no longer exists and has not existed since 1922. We are not acting "in the face of such an alternative." There is no longer any reason or need to give the term "civil officer" an artificially narrow definition. Under the provisions of the present Constitution, the term "civil officer" should be given its normal meaning as any officer other than a military officer. Unquestionably, members of the Public Service Commission qualify as officers in the Constitutional sense, and thus constitute civil officers within the meaning of Article II, § 15.

### B. Maryland Constitutional History.

### 1. Separation of Powers Generally

In this situation we are constrained to construe the meanings of the various constitutions of Maryland, the amendments thereto, and must review our cases, and perhaps foreign cases, concerning this area of constitutional law. We shall also consider treatises on certain of the issues.

Underlying the arguments of the parties, is the centuries old debate as to the extent to which the Separation of Powers doctrine is to apply as a limitation in controversies between the respective branches of government. This debate has

never been resolved, with the issues being driven slightly one way and then slightly the other way, generally by the decisions of this Court. But that problem was anticipated by the framers of the Federal Constitution.

"Experience has instructed us that no skill in the science of government has yet been able to discriminate and define, with sufficient certainty, its three great provinces, the Legislative, Executive and Judiciary.... Questions daily occur in the course of practice, which prove the obscurity which reigns in these subjects, and which puzzle the greatest adepts in political science."

The Federalist No. 37, at 235 (James Madison) (J. Cooke ed., 1961). And see:

"There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission [constitution] under which it is exercised, is void. No legislative act therefore contrary to the constitution can be valid. To deny this would be to affirm that the deputy is greater than his principle; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers, may do not only what their powers do not authorize, but what they forbid."

The Federalist No. 78, at 524 (Alexander Hamilton) (J. Cooke ed., 1961).

The first explicit constitutional statement of the separation of powers concept in Maryland is found in Article 6 of the Bill of Rights of the Maryland Constitution of 1776. We noted in our case of *Board of Supervisors of Election v. Todd,* 97 Md. 247, 262–63, 54 A. 963 (1903):

"[T]he powers of our State government w[ere] declared in our original Bill of Rights accompanying the Constitution of 1776 in this Language, 'That the Legislative, Executive and Judicial powers of government ought to be forever separate and distinct from each other.'" Art. 6, Bill of Rights, 1776.

. . .

"In the subsequent Constitutions adopted in this State in 1851, 1864 and 1867 the declaration, which has been quoted from the Bill of Rights of 1776, has been incorporated, and emphasized by adding thereto this language of exclusion 'and no person exercising the functions of one of the departments shall assume or discharge the duties of any other.' "

The language of the original Bill of Rights as modified by added language, remains and is found in Article 8 of the present Declaration of Rights of the current Maryland Constitution.

The book, *State Constitutionalism in Maryland*, by Michael C. Tolley, speaking to Article 8, notes that: "This provision forbids the usurpation of one branch's power by another. In addition, because each branch must remain independent, no branch may constitutionally inhibit another's exercise of its constitutional powers. Otherwise, all power would gravitate to the branch imposing the greatest interference, subjugating the other branch." Michael Carlton Tolley, *State Constitutionalism in Maryland* 18–19 (Univ. Microfilms Int'l 1991). Additionally, Tolley states:

"The ease with which the Maryland Constitution may be altered gives to the General Assembly almost unlimited power in all areas. Where the power of the legislature is omnipotent, like that of the British Parliament, the need to preserve the distinction between fundamental laws embodied in written constitutions and ordinary legislative acts increases. One way in which the court can preserve the distinction is by jealously guarding its prerogative and maintaining its power to strike down acts in violation of the constitution.

"Though the relationship between separation of powers and individual liberty had been known for some time, the adoption in Maryland of this axiom of government was by no means a foregone conclusion. Article 6 of Maryland's first Declaration [Bill] of Rights, stating that the three branches of government ought to be forever separate, was

adopted in convention by a margin of only one vote, 30 to 29."

*Id.* at 247.

The Convention that was working on the drafts of the 1776 Constitution was considering it during very charged circumstances. During the Convention's deliberations, the British, under General Howe, attacked Long Island and Maryland troops bore the brunt of the attack. Two hundred fifty-six Marylanders were killed or wounded in the battle; all the while the Convention was involved with drafting the Bill of Rights. In ten days the Convention presented a draft of the Bill of Rights, and two weeks later a "Form of Government." [27]

H.H. Walker Lewis in *The Maryland Constitution 1776* (1976), notes that:

> "*Separation of powers.* One of the Proprietary grievances was that the Governor and his Council exercised legislative, executive, and judicial powers, as [ ] did the Proprietor, and as did Parliament. This was recognized as a potential source of oppression, and violated the political theories that Montesquieu and others had brought into vogue."

*Id.* at 47.[28] In Section 33 of the Constitution of 1776, the relevant powers of the Governor[29] were stated as follows:

---

27. In early constitutional proceedings, in order to distinguish it from what was then called the Maryland "Bill of Rights" (later to become the Declaration of Rights) the document that later came to be called "The Constitution of Maryland" was referred to as the "Form of Government." Accordingly, in discussions of the early constitutional proceedings, whenever the term "Form of Government" is used, its meaning is synonymous with the term, "The Maryland Constitution," as we use it today.

28. Mr. Lewis also noted the difficulty in keeping certain of the members of that deliberative body present for the convention debates: "[T]hen as now, Eastern Shoremen considered a day on the wrong side of the Bay to be a day of paradise lost." Lewis, *supra*, at 39.

29. It is important to remember when considering the history of the powers of the respective branches of government that in the 1776 Constitution the Governor and his Council were to be chosen by the

"That the governor ... may alone exercise all other [ ] executive powers of government, where the concurrence of the council is not required, according to the laws of this State, ... but the governor shall not, under any pretense, exercise any power or prerogative, by virtue of any State law, statute or custom of England or Great–Britain."

Lewis, *supra*, at 77–78. The last phrase of that original constitution has since been deleted from the Maryland Constitution. It apparently related to the situation in the Revolutionary era during which the 1776 Constitution was being debated and was considered unnecessary in later periods.

The last sentence of what is now Article 8 of the Declaration of Rights was added by the Constitution of 1851. As noted earlier, it was then called the Bill of Rights. The proceedings of the Convention that drafted the 1851 Constitution include the debates on the Bill of Rights. Most of the early debate centered on the issue of the "compact with the people" language of Article 1. When Article 6 (since amended to be Article 8) came up for debate the following occurred:

"The sixth article was read as follows:

"*Art.* 6. That the legislative, executive and judicial powers of government ought to be forever separate and distinct from each other.

"Mr. BRENT, of Baltimore City, moved the following amendment:

"Add at the end of the article the following words:

'And no person or persons exercising the functions of one of said departments, shall assume or discharge the duties of any other.'

"Mr. DORSEY suggested that there was one difficulty which presented itself to his mind, if this amendment should be adopted. It might exclude the Senate of Maryland, that

---

General Assembly and thus were its creation and subordinate to it. Later, that was changed and the Executive became a truly separate and independent branch of government.

highest tribunal, appointed by the Constitution of Maryland, from sitting as a court of appeals.

"Mr. BRENT said he presumed that the Constitution would make provision for that case. He had offered his amendment, because the old article in the bill of rights did not prevent a member of Legislature from being a judge, or even the executive. He, therefore, desired to exclude from the Legislature, any member of the judiciary, and from the judiciary any member of the Legislature. The subject had been discussed here at an earlier state of the session; and he saw no harm that could result from his amendment.

"The question was then taken, and by yeas 34, noes 26, the amendment of Mr. BRENT was adopted."

*Debates and Proceedings of the Maryland Reform Convention to Revise the State Constitution,* vol. 1, 187 (William M'Neir, Official Printer, 1851).

By an amendment to the Constitution, passed and approved by the voters in 1891, the power of the Executive was again increased when the Governor was granted veto power over legislation. By this time the constitutionalists of the day had apparently become somewhat apprehensive of the power of the Legislature in that it had been attempting to exercise the power of the Executive. The language of the amendment that was presented to the voters stated, in relevant part, " 'To guard against hasty or partial legislation, *and encroachments of the legislative department upon the co-ordinate executive and judicial departments,* every bill ... shall, before it becomes a law, be presented to the Governor of the State....' " *Bill of Rights and Constitution of Maryland* 88 (William J.C. Dulany, 1899) (emphasis added). Thus, one of the stated reasons for the creation in the Constitution of the veto power was a fear of encroachments upon the Executive and Judicial branches by the Legislature.

Alfred S. Niles in *Maryland Constitutional Law,* published in 1915, even then noted:

"A rather curious development of late years is the establishment of certain agencies of government, regarding which it is difficult to tell to which great department they belong.

"The Public Service Commission of Maryland, for example, has functions that are partly judicial, partly administrative and partly legislative."

. . .

"It may be, therefore, in the future, that the difficulty of classifying a governmental agency [30] will lead to difficulties in applying the rule as laid down in this section of the Declaration of Rights. Nevertheless the rule itself is firmly established, not only by the plain words of the article, but by the decisions of the court giving these words their fullest force and effect. . . ."

Alfred S. Niles, *Maryland Constitutional Law* 21–22 (Hepbron & Haydon, 1915)

Charles James Rohr, Ph.D., an assistant professor of History and Political Science, Trinity College, Hartford, Connecticut, in 1932 published a book on the increase in power that the Executive had been granted by the various Maryland constitutions. The book, *The Governor of Maryland—a Constitutional Study,* published by the Johns Hopkins Press, initially discussed the weakness of the Governor and Council setup created by the Revolutionary era Constitution of 1776. He then explains the change that occurred first in 1837, stating:

"Under the constitution of 1776, the governor was purely an executive officer, as we have seen, and his position was wholly a dependent one. . . . To all intents and purposes, the office of governor remained in that same dependent position until 1837, when the first great alteration occurred in the state constitution and relieved the governorship from its position of dependence.

---

**30.** That difficulty is, for the most part, resolved when, as in 1998, the Legislature creates an agency and declares that it is to be an "independent unit in the Executive Branch of State government." Chapter 8, § 2 of the Acts of 1998; PUC § 2–101.

. . .

"By the terms of the [1776] constitution, the state was a confederation of counties, each with equal representation in the popular House without regard to population or wealth. . . . Since the executive department, which appointed most of the civil officers, was 'the creature of the legislature,' it, too, was controlled by the entrenched minority. . . .

. . .

"In the latter part of 1836 . . . the legislature, resisting successfully the calling of a convention, was coerced into offering a palliative in the form of an amendment to the constitution making many of the desired changes. . . .

. . .

"By the amendment of 1837 the executive department was almost entirely reorganized. That part of the [1776] constitution which related to the governor and council was abrogated, abolished, and annulled. The council was abolished and the whole executive power of government was vested exclusively in the governor, subject, nevertheless, 'to the checks, limitations and provisions' enumerated in the amendment.

. . .

"With regard to appointments, the executive council having been abolished, the governor was empowered to nominate, and by and with the advice and consent of the Senate, to appoint all officers of the state whose appointment was not otherwise provided for in the constitution or laws." Charles J. Rohr, *The Governor of Maryland* 67–70 (The Johns Hopkins Press 1932) (footnotes omitted).

Professor Rohr, after discussing the diminution of the Governor's appointment powers in the Constitution of 1851 and, in respect to those same powers, the Constitution of 1864, notes that the present constitution, the Constitution of 1867, re-

stored much of the power to the Governor: "With the framing of the last constitution, the powers of the governor of Maryland received their greatest advance." *Id.* at 79. Additionally:

"Every one of the Constitutions of Maryland has marked some changes in the position and power of the governor. In some instances, these changes have been of a retrogressive character; but, on the whole, the tendency has been to strengthen the position of the governor as a component part of the State Government, and to augment his powers and prerogatives. In none of the Constitutions is this tendency more marked than in the Constitution of 1867."

*Id.* at 85 (footnotes omitted). After briefly discussing the addition of governmental power, Professor Rohr discusses the reasons for the increase in the appointment power of the governor:

"Offering several interesting reasons for this increase in gubernatorial appointing power, the argument of one of the members of the Convention [of 1867] is herein given. Mr. Henry F. Garey, of Baltimore, said, in brief: The Democratic Party, in its reforms, by making nearly all the offices elective by the people has done much to demoralize them. The desire for office which had been generated by this action has so taken hold of the people that it has weaned many of them from their occupations and caused much sorrow and trouble, and the Democratic Party is to blame for it by committing so much to the people.... It is time to return to the old constitutional landmarks.

. . .

"The concomitant power of removal is carried over with two important changes. The present constitution states that the governor may 'remove for incompetency or misconduct all civil officers who received appointment from the Executive *for a term of years*;' whereas, the Constitution of 1864 specified officers appointed 'for a term not exceeding two years.' This change is especially significant because it obviously broadens the range of the governor's removal

power to include a much larger number of officers than was included under the old Constitution."

*Id.* at 88–89 (footnotes omitted).

Modern commentators, while acknowledging this Court's different discussions of the doctrine of separation of power over its history, nonetheless, adhere to its basic principles. Friedman, in *The Maryland State Constitution—A Reference Guide,* while recognizing that this Court (according to him) has taken a somewhat elastic concept of the separation of powers doctrine,[31] qualifies that use of the term by affording a higher degree of constitutional strictness when it comes to the core functions of a respective branch. Friedman notes that:

"In evaluating the appropriate flexibility, Maryland courts appear to apply three levels of separation of powers analysis under which the constitutionality of a delegation or assignment of authority is determined by how close a function is to the 'core' functions of a given branch.

"At the first level are the core functions assigned to a given branch. In determining the core functions of each branch, courts look first to the constitutional text creating each branch.... Core executive functions include the administration and enforcement of the laws."

Dan Friedman, *The Maryland State Constitution* 19 (G. Alan Tarr ed., Praeger 2006).

In addition to the treatises above as to the history of Maryland's specific experiences with the separation of powers doctrine, the doctrine has been discussed, generally, in several Law Review articles. Jonathan Zasloff, *Taking Politics Seriously: A Theory of California's Separation of Powers,* 51 UCLA L.Rev. 1079 (2004); G. Alan Tarr, *Interpreting the Separation of Powers in State Constitutions,* 59 N.Y.U. Ann. Surv. Am. L. 329 (2003), John Devlin, *Toward a State Constitutional Analysis of Allocation of Powers: Legislators and*

---

**31.** We have found one reference to the term *elastic,* or a derivative, in our more modern cases. We used the term "elasticity" in *Department of Natural Resources v. Linchester Sand and Gravel Corp.,* 274 Md. 211, 220, 334 A.2d 514, 521 (1975).

*Legislative Appointees Performing Administrative Functions,* 66 Temp. L.Rev. 1205 (1993). In the view of these commentators, the separation of powers principle in state constitutions is different than that of the Federal Constitution and, as a result, is subject to a different and stricter type of analysis. This is particularly important in states such as Maryland where the separation of powers doctrine is expressly included in the State Constitution.

Professor Tarr explains that the express mandates require that "those interpreting state constitutions must be prepared to act as constitutional geologists, examining the textual layers from various eras in order to arrive at their interpretation." [32] Tarr, *supra,* at 332. Professor Tarr also points out that:

> "[B]oth federal and state constitutions agree with Montesquieu in positing three branches of government—legislative, executive, and judicial—each invested with a distinct function. The institutions created at the national and state levels also have a surface similarity: state legislature and Congress, governor and president, state supreme court and U.S. Supreme Court. But when one proceeds below the surface, one finds that these apparently analogous structures of government and separations of power quickly evaporate."

*Id.* at 333 (footnotes omitted).

In his view, the evolution of the Executive and especially the practice of electing Executive officers makes the states' approach to separation of powers very different than that of the federal government. In addition, states' legislatures, unlike Congress, have more limited resources and meet in shorter sessions, which, according to Tarr, serves as a control on the legislature and its ability to do harm. For a comparison between the U.S. Constitution and the Maryland Constitution, see Charles A. Rees, *State Constitutional Law for Maryland*

---

**32.** We earlier noted the importance of such a review of history in footnote 30, *supra,* in respect to the interpretation of precedent being based on the times of the respective decision and the particular constitution then in effect.

*Lawyers: Judicial Relief for Violation of Rights,* 10 U. Balt. L.Rev. 102, 106–11 (1980).

Professor John Devlin, from the Paul M. Herbert Law Center of the Louisiana State University, analyzed the separation of powers doctrine in relation to the appointment of state officials. As he explains, separation of powers principles in state constitutions' differ greatly from that of the Federal Constitution. As a result, state courts should be especially careful in using federal cases and other states' cases in their analysis of separation of powers issues. He describes the different approaches utilized in state constitutions dealing with the issue:

"Ten state constitutions follow the federal pattern by omitting any express requirement of separation of powers, incorporating that principle instead only by implication from provisions establishing the three branches of the state government and 'vesting' each type of power in one of those branches.[33]  Twelve states go beyond this to include an express statement that governmental powers shall be separated, either standing alone [34] or coupled with an express

---

**33.**  "The ten states without express separation of powers provisions are Alaska, Delaware, Hawaii, Kansas, New York, North Dakota, Ohio, Pennsylvania, Washington, and Wisconsin.  All ten, however, explicitly vest legislative, executive, and judicial powers in those three branches. Alaska Const. art. II, § 1, art. III, § 1, art. IV, § 1, Del. Const. art. II, § 1, art. III, § 1, art. IV, § 1;  Hawaii Const. art. III, § 1, art. V, § 1, art. VI, § 1;  Kansas Const. art. 1, § 3, art. 2, § 1, art. 3, § 1;  N.Y. Const. art. III, § 1, art. IV, § 1, art. VI, § 1 (phrased in terms of creating 'unified court system' rather than 'vesting' judicial power); N.D. Const. art. III § 1, art. V, § 1, art. VI, § 1, art. XI, § 26 (explicitly stating three branches are 'co-equal'); Ohio Const. art. II, § 1, art. III, § 5, art. IV § 1;  Pa. Const. art. II, § 1, art. IV, § 2, art. V, § 1;  Wash. Const. art. II, § 1, art. III, § 1, art. IV, § 1;  Wisc. Const. art. IV, § 1, art. V, § 1, art. VII, § 2." Devlin, at 1236 n. 109.

**34.**  "Six states—Connecticut, Mississippi, New Hampshire, North Carolina, Rhode Island, and South Dakota—have provisions that, though variously worded, confine themselves to an expression of the separation [of] powers principle.  Conn. Const. art. II; N.C. Const. art. I, § 6; Miss. Const. art. I, § 1; N.H. Const. Part First, art. 37; R.I. Const. art. V; S.D. Const. art. II. The New Hampshire provision is noteworthy in that it clearly presupposes that the principle will not be imposed in its

prohibition against any department exercising any powers belonging to another, except as otherwise provided elsewhere in the constitution.[35] The remaining state constitutions are even more pointed, coupling an express statement of the separation principle with an additional clause explicitly prohibiting 'any person' belonging to or exercising power under any branch from holding any office [36] or exercising any power or function [37] belonging to another."

---

full conceptual rigor: 'In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity.' N.H. Const. Part First, art. 37." Devlin, at 1236 n. 110.

Madison's Federalist Number 47 utilized the New Hampshire constitution as one of the examples in discussing the separation of powers doctrine:

"New Hampshire, whose constitution was the last formed, seems to have been fully aware of the impossibility and inexpediency of avoiding any mixture whatever of these departments; and has qualified the doctrine by declaring 'that the legislative, executive and judiciary powers ought to be kept as separate from, and independent of each other *as the nature of a free government will admit; or as is consistent with that chain of connection, that binds the whole fabric of the constitution in one indissoluble bond of unity and amity.'* "

The Federalist No. 47, at 327 (James Madison) (J. Cooke ed., 1961).

**35.** "Six states—Alabama, Arizona, Illinois, Massachusetts, Oklahoma, and Vermont—have provisions of this type. Ala. Const. art. III, §§ 42 & 43; Ariz. Const. art. III; Ill. Const. art. II, § 1; Mass. Const. pt. 1, art. XXX; Okla. Const. art. IV, § 1; Vt. Const. ch. II, § 5. Again, while these provisions are very differently phrased, the basic content is common." Devlin, at 1236 n. 111.

**36.** "Louisiana appears to be the only state with provisions so phrased:
§ 1. Three Branches
Section 1. The powers of government of the state are divided into three separate branches: legislative, executive, and judicial.
§ 2. Limitations on Each Branch
Section 2. Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.
La. Const. art. II, §§ 1 & 2." Devlin, at 1237 n. 112.

**37.** "Twenty-seven states have constitutional separation of powers provisions of this type. Ark. Const. art. IV, § 1; Cal. Const. art. III, § 3;

Devlin, *supra* at 1236–37 (footnotes omitted). The Maryland Constitution reflects the more stringent approach and, thus, situations where separation of powers questions are involved should be carefully scrutinized and the doctrine afforded a high degree of protection.

Professor Devlin compared the different states' approach to appointment of Executive officers, which is important in the analysis of the power of removal and for determining to whom such power belongs:

"Other textual provisions relevant to this analysis also show marked variations from state to state. Virtually all states have constitutional provisions that vest executive authority in the governor and impose upon the governor a duty to see that the laws are faithfully executed. Yet states disagree on what specific powers their respective governors will be given to carry out this duty. Some states vest a general power to make administrative appointments in the governor [38] or specifically debar the legislature from mak-

---

Colo. Const. art. III; Fla. Const. art. II, § 3; Ga. Const. art. I, § II, para. III; Idaho Const. art. II, § 1; Ind. Const. art. 3, § 1; Iowa Const. art. III, § 1; Ky. Const. §§ 27 & 28; Me. Const. art. III, §§ 1 & 2; Md. Const. Declaration of Rights, art. 8; Mich. Const. art. III, § 2; Minn. Const. art. III, § 1; Mo. Const. art. II, § 1; Mont. Const. art. III, § 1; Neb. Const. art. II, § 1; Nev. Const. art. 3, § 1; N.J. Const. art. III, para. 1; N.M. Const. art III, § 1; Or. Const. art. III, § 1; S.C. Const. art. I, § 8; Tenn. Const. art. II, § 1; Tex. Const. art. II, § 1; Utah Const. art. V, § 1; Va. Const. art. III, § 1; W. Va. Const. art. 5, § 1; Wyo. Const. art. 2, § 1. The Tennessee provision may be taken as typical: 'No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.' Tenn. Const. art. II, § 2." Devlin, at 1237 n. 113.

**38.** "One common format for vesting such broad appointment powers in the governor recites that, unless otherwise provided in the constitution, the governor shall appoint all single executive heads of departments and all boards or commissions which head departments, or which have regulatory or quasi-judicial functions. *See, e.g.,* Alaska Const. art. III, §§ 25–26 (Governor appoints department heads and approves selection of chief executive officer); Mich. Const. art. V, § 3 (Governor appoints executive officer); N.J. Const. art. V, § IV (same); S.D. Const. art. IV, § 9 (same). Other provisions are variously phrased, but are equally clear that it is the governor who has the power to appoint, though that

ing such appointments,[39] while others leave it to the legislature to decide the method by which officials will be appointed—including, in some cases, reserving that power to itself.[40] Some states carefully differentiate those adminis-

power is sometimes subject to confirmation by the Senate or the legislature as a whole. *See, e.g.,* Fla. Const. art. IV, § 6(a) (requiring either confirmation by Senate or approval by three cabinet members); Ill. Const. art. V, § 9(a) (requiring majority of Senate); Minn. Const. art. V, § 3 (requiring advice and consent of Senate); Mo. Const. art. IV, § 51 (same); N.Y. Const. art V, § 4 (same); Va. Const. art. V, § 10 (requiring confirmation by General Assembly).

"Particularly when combined, as they usually are, with additional provisions making clear that such appointees serve at the pleasure of the governor, these appointment provisions obviously strengthen the governor, and tend to locate both control of the administrative bureaucracy and responsibility for its actions squarely in the governor's hands." Devlin, at 1237–38 n. 115.

39. "*See, e.g.,* Ill. Const. art. V, § 9(a) (prohibiting General Assembly from electing or appointing officers of executive branch). In a few states this prohibition stands as a specific exception to the legislature's otherwise plenary authority to regulate how administrative officials will be chosen. *See, e.g.,* Ohio Const. art. II, § 27 (prohibiting General Assembly from making any appointment or filling any vacancy); W. Va. Const. art. VII, § 8 (same)." Devlin, at 1238 n. 116.

40. "... A more common method of granting effective power to the legislature is for the state constitution to provide that the governor may appoint subordinate officials only insofar as he is authorized to do so 'by law' or, alternatively, that the governor enjoys the power to appoint unless the legislature provides by law for some other methods of election or appointment of that official. *See, e.g.,* Del. Const. art. III, § 9 (providing exception for vacancies that occur within two months of election); Ind. Const. art. 15, § 1 (appointments not provided for in constitution must be appointed as prescribed by law); Kan. Const. art. 15, § 1 (same); Me. Const. art. V, pt. 1, § 8 (same); Md. Const. art. II, § 10 (same); Nev. Const. art. 15, § 10 (same); Okla. Const. art. VI, § 13 (same); Pa Const. art. IV, § 8 (providing various methods of making appointments depending on office involved and time of vacancy); R.I. Const. art. IX, § 5 (same as Indiana); Tenn. Const. art. VII, § 4 (granting legislature power to establish method of filling vacancies); Vt. Const. art. II, § 20 (appointment power limited by constitution and law passed by legislature); Wis. Const. art. XIII § 9 (same).

"Several state courts have held that such provisions have the effect of authorizing the legislature to vest itself with the power to make certain administrative appointments, and that no violation of separation of powers inheres in doing so. *See, e.g., State ex rel. Rosenstock v. Swift,* 11 Nev. 128, 142–43 (1876) (recognizing authority of legislature to choose officers of municipal corporations); *Richardson v. Young,* 122

trators who must be gubernatorial appointees from those for whom the legislature may determine the method of appointment,[41] while in other states the text is, on its face, remarkably unclear as to which branch controls the mechanisms of appointment.[42]"

Devlin, *supra*, at 1237–38.

Professor Devlin recognized that some states have adopted a "formalist" approach to separation of power questions, where one must attempt to assign a specific classification to the office in question, i.e., Executive, Legislative or Judicial. *Id.* at 1246. Other courts, however, take a "functionalist" approach in which the analysis turns on who has control of the office in question. *Id.* At 1247. Professor Devlin proposed that these two approaches are flawed, as the "formalist" approach is difficult to apply in most instances and the "func-

---

Tenn. 471, 125 S.W. 664, 668 (1910) (recognizing power of appointment does not rest exclusively in any one branch); see also *Caldwell v. Bateman*, 252 Ga. 144, 312 S.E.2d 320 (1984) (upholding statute permitting legislature to make appointments to administrative body, without discussion of appointments clause of state constitution); *Parcell v. State*, 228 Kan. 794, 620 P.2d 834, 837 (1980) (same)." Devlin, at 1238 n. 117.

41. "Interestingly, the Hawaii Constitution provides that the legislature may prescribe how individual heads of departments are to be chosen, but that the governor must appoint members of boards or commissions. Haw. Const. art. V, § 5. The Louisiana Constitution, in contrast, makes precisely the opposite allocation. La. Const. art. IV, § 5(H)." Devlin, at 1238 n. 118.

42. "Provisions of this sort typically provide that the governor shall appoint all officers whose appointment 'is not otherwise provided for.' Such language leaves unclear whether the 'other provision' referred to must be found in the state constitution or may be provided by statute. If the former, then the governor has wide powers of appointment. If the latter, then the legislature will have significant control over the appointment process. *See, e.g.*, Colo Const. art. IV, § 6; Idaho Const. art. IV, § 6; Mont. Const. art. VI, § 8; N.M. Const. art. V, § 5; N.C. Const. art. III, § 5(8); Utah Const. art. VII, § 10; W. Va. Const. art. VII, § 8.

"At least one court has construed this language to mean that the governor has appointment authority unless the legislature otherwise provides. *State ex rel. Martin v. Melott*, 320 N.C. 518, 359 S.E.2d 783, 785–86 (1987)." Devlin, at 1238–39 n. 119.

tionalist" approach does not necessarily lead to a complete analysis of the separation of powers issue. He favors, instead, a third approach in which

"the crucial inquiry does not focus solely on any conceptual classification of functions, but rather considers all of the specific facts of the case to determine whether the challenged arrangement constitutes a 'usurpation by one department of the powers of another department,' defined as whether a department is being 'subjected directly or indirectly to the coercive influence of' another, and whether there is 'a significant interference by one department with the operations of another department.' "

Devlin, *supra* at 1249 (quoting *Parcell,* 620 P.2d at 836 (quoting *State ex rel. Schneider v. Bennett,* 219 Kan. 285, 547 P.2d 786, 792 (1976))).

█ The Legislature's termination of the current Commissioners in the case *sub judice* fails all three of the separation of powers tests suggested by Devlin. First, the Public Service Commission is an Executive agency as expressly provided in the statute and under the "formalist" approach the removal of the Commissioners is a power reserved to the Executive. The "functionalist" approach is also violated as the Legislature was clearly attempting to control the actions of an agency in the Executive Branch. The General Assembly's decision to terminate the current Commissioners was purely for the purposes of controlling or supervising the Commission it created as an Executive Branch agency. Were the Legislature free to terminate Executive non-constitutional officers in such manner, a precedent would be created in which all non-constitutional officers with a definite term would be serving in fear of Legislative action and therefore unable to discharge their duties independently. In such a case the Legislature would be able to control a large portion of the functions of the Executive Department of State Government.

Finally, the Legislature's action in the case *sub judice* also fails the more pragmatic approach, favored by Devlin. Article II, § 15 of the Maryland Constitution provides that it is the

Governor who has removal authority of all civil officers. The Legislature's attempt to remove the Commissioners through the use of Senate Bill 1 "constitutes a 'usurpation by one department of the powers of another department[.]'" *See,* Devlin, *supra.* Such action clearly interferes with the functions specifically granted to the Governor by the Maryland Constitution.

## 2. Separation of Powers as to Functions

It is with this constitutional grounding that we discuss our cases, keeping in mind that some of the later cases that were, to some extent, based upon precedent, were based upon precedents that were creatures of the times in which the early cases were decided. What was true under the "Form of Government" or "Bill of Rights" in 1776, may not be correct under the 1837 amendment or the Maryland Constitutions of 1851, 1864 and 1867 or the present Declaration of Rights. It has not always been recognized by the Court or by the commentators, that what may have been said or held when the Constitution and Bill of Rights of 1776, or other of the specific amendments and constitutions were being considered, may not be of direct precedential value when the present Constitution, that of 1867, a constitution in which power of the Executive is returned and the 1891 amendment conferring veto power, is being considered. Although the cases (and the treatises) sometimes overlap as to functions and the appointment/termination processes, we shall first concentrate on the holdings relating primarily to the usurpation of and improper granting of general powers.

The case *sub judice* is a rare case where it is alleged that the Legislative department of government is attempting to exercise what are essentially executive functions, and doing so not only in disregard for the general precepts of the duties and powers of the respective branches of government, but in violation of express provisions of the Maryland Constitution, including, but not limited to, Section 8 of the Maryland Declaration of Rights and Article II, §§ 1, 9 and 15 of the

Maryland Constitution, and in the process denying to the appellant due process of law.[43]

Few of our prior cases have involved conflicts between the Legislative and Executive branches of government. But, we have often been obliged to determine when the Legislative Department has either attempted to exercise a judicial function or has passed statutes attempting to confer on the Judicial Department, duties of a legislative or executive nature. Generally, we have resisted those efforts.

The Declaration of Rights expressly establishes (or continues the concept first created by the "Bill of Rights" of the 1776 Constitution and subsequent amendments and constitutions) the Separation of Powers concept, as an explicit Maryland Constitutional command (in contrast with the creation of such concept by implication in the Federal Constitution). Article II, § 1 of the Constitution expressly directs that "[t]he executive power of the State shall be vested in a Governor," Article II, § 9 of the Constitution of Maryland provides that the Governor executes the laws, and Article II, § 15 expressly confers on the Executive the power to terminate officers he or she has appointed for a term of years, based upon incompetency or misconduct. Article 8 of the Declaration of Rights expressly established the Separation of Powers Doctrine as part of the "organic" law of Maryland.

---

**43.** We said in *Miles v. Stevenson*, 80 Md. 358, 365–66, 30 A. 646, 648–49 (1894) that:

"Though the Code of Public Local Laws gave them plenary power to remove a road supervisor for incompetency, wilful neglect of duty, or misdemeanor in office, it conferred upon them no authority to deprive the relator of his office upon an *ex parte* proceeding founded on a cause not specified in the statute and carried on without notice to him and without according him an opportunity to be heard or to make defense. Such a procedure has neither the form nor the semblance of a judicial inquiry, and is contrary to the plainest precepts of natural justice. It lacks the essential prerequisites of a valid legal judgment, for neither could the County Commissioners have lawfully removed the relator for a cause not named in the statute, nor could he have been properly deprived of his office before its term had elapsed without due process of law, and due process of law in such instances imperatively requires that the person to be affected must have notice of the proceedings against him and must have an opportunity to be heard in his own behalf."

Shortly after the American Revolution, in the case of *Whittington v. Polk*, 1 H. & J. 236 (1802) (when the 1776 Constitution was in effect), a case in which the Legislature restructured certain non-judicial courts in such a fashion that the office holders lost their jobs, we addressed the general relationship of the respective branches of government—but we did so at a time when the Maryland Constitution made the Governor a creature of the Legislature. Even under the circumstances of that time, the Court *did not recognize* the extent of the power the Legislature's spokesman claims in the case *sub judice*. We said then:

> "The Bill of Rights and form of government compose the Constitution of Maryland, and is a compact made by the people of Maryland among themselves, through the agency of a convention selected and appointed for that important purpose. This compact is founded on the principle that the people being the source of power, all government of right originates from them. In this compact the people have distributed the powers of government in such manner as they thought would best conduce to the promotion of the general happiness; and for the attainment of that all-important object have, among other provisions, judiciously deposited the legislative, judicial and executive, in separate and distinct hands, subjecting the functionaries of these powers to such limitations and restrictions as they thought fit to prescribe. The Legislature, being the creature of the Constitution, and acting within a circumscribed sphere, is not omnipotent, and cannot rightfully exercise any power, but that which is derived from that instrument.

> . . .

> "The power of determining finally on the validity of the acts of the Legislature cannot reside with the Legislature, because such power would defeat and render nugatory, all the limitations and restrictions on the authority of the Legislature, contained in the Bill of Rights and form of government, and they would become judges of the validity of their own acts, which would establish a despotism, and

subvert that great principle of the Constitution, which declares that the powers of making, judging, and executing the law, shall be separate and distinct from each other.

. . .

"The three great powers or departments of government are independent of each other, and the Legislature, as such, can claim no superiority or pre-eminence over the other two."

*Id.* at 242–45.

In 1829, this Court further described the constitutional functioning of the government of Maryland in the often cited divorce and support case of *Crane v. Meginnis,* 1 G. & J. 463 (1829), in which the Legislature attempted to perform judicial acts. There we discussed what the Court then referred to, *under the circumstances then present, i.e., the Constitution of 1776 which made the Governor a creation of the Legislature,* as a predominant power when we stated:

"The Constitution of this State, composed if [sic] the Declaration of Rights and form of government, is the immediate work of the people, in their sovereign capacity, and contains standing evidences of their permanent will. It portions out supreme power, and assigns it to different departments, prescribing to each the authority it may exercise, and specifying that from the exercise of which it must abstain. The public functionaries move then in a subordinate character, and must conform to the fundamental laws or prescripts of the creating power. When they transcend defined limits, their acts are unauthorized, and being without warrant, are necessarily to be viewed as nullities. . . .

"The legislative department is nearest to the source of power, and is manifestly the predominant branch of the government.[44] Its authority is extensive and complex, and

---

44. As we continue to emphasize, at this time in history the Governor and his Council were still themselves appointed by the Legislature. *Crane* was decided prior to the 1837 Amendment. Accordingly, the weakness of its "predominant" language as precedent subsequent to the

being less susceptible on that account of limitation, is more liable to be exceeded in practice. Its acts, out of the limit of authority, *assuming the garb of law,* will be pronounced nullities by the Courts of justice. . . ."

*Crane,* 1 G. & J. at 472. The Court went on to opine:

"The enactment of the third section of the Act of 1823, being in our opinion an exercise by the Legislature of judicial power, our attention will now be engaged for a short time with the enquiry whether the exercise by the Legislature of judicial power in the passage of a law, is repugnant to the Constitution.

"The decision of this point must depend upon the sound construction of the sixth section of the Bill of Rights, which says, 'that the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other.' This political maxim made its appearance, in some form, in all the State Constitutions formed about the time of the war of the Revolution, and is said to have been borrowed by them of the celebrated *Montesquieu's Spirit of Laws,* vol. 1, p. 181.

. . .

". . . [W]e have now to add our perfect conviction, that the exercise by the Legislature of judicial power in the passage of a law, is repugnant to the Constitution."

*Id.* at 475–77.

█ In a case involving the counting of votes in respect to the ratification of the Constitution of 1864, *Miles v. Bradford,* 22 Md. 170 (1864), we stated:

"By our organic law,[45] the powers of government are distributed into Legislative, Executive and Judicial. We are

---

constitutions of 1851, 1864 and 1867, must be understood in light of the times in which the language originally was used.

**45.** At oral argument representations were made by the State that Senate Bill 1 was the organic law of the State. Were the State to be correct, the Legislature would be creating organic law every time it

admonished by the Declaration of Rights, that these powers 'ought to be forever separate and distinct from each other, and no person exercising the functions of one of said departments, shall assume or discharge the duties of any other.' "
*Id.* at 183.

Also at issue in the case *sub judice* is the question of whether incumbent officeholders may assert interests in the office they hold. We considered a similar issue in one of our old cases. The case of *Magruder v. Swann*, 25 Md. 173 (1866), involved a dispute that had arisen as to the granting of a commission to a person to sit as a judge. The issue occurred because of a judicial vacancy during the period when a new constitution was being adopted. The new constitution reduced the number of counties in a particular circuit. In an ensuing period the Governor had appointed a replacement judge and another individual had won an election to a seat on the bench in the new circuit. Thus, there were two claimants for a single seat, one by election and one by appointment by the Governor. The complaining party sought possession of the judicial seat, which the incumbent refused to vacate, and the complaining party then sought a mandatory injunction against the possessor of the seat and a writ of *mandamus* against the Governor, commanding him to issue a commission to the petitioner as "Judge of the said circuit." We said that:

> "The provisions of the Constitution, for the trial of causes, in case of the disqualification of the incumbent, (Art. 4, secs. 7 and 8,) are said to apply only to cases where the Judge is affected in person or property, but not to those involving his right to his office. Neither the language of the Constitution, nor its spirit, in our judgment, warrants any such limitation to its meaning. *An office is often the most valuable property a person possesses. If the owner of land, goods or chattels may come into the court in which the Judge presides, and demand a writ against him for an*

---

enacted a statute. The organic law of the State is the Constitution of Maryland and the Declaration of Rights, not the statutes passed pursuant to the power granted in the organic law.

*injury to these, what conceivable reason is there for excluding one who claims the high functions of the judicial office to which a salary is annexed, which he charges is withheld from him by the incumbent?*

. . .

". . . Each of the co-ordinate departments of the Government is independent of the other in the sphere of its action, and has duties to perform in which it is not subject to the control of the other. But this independence does not proceed from the grade of the officer so much as the nature of the act to be performed.

"The Governor, in his political and executive duties requiring the exercise of his judgment and discretion, is entirely independent of any other authority."

*Magruder*, at 205–09 (emphasis added).

In a civil war era case somewhat similar to the present case, except that it involved Legislative infringements on the power of the Judiciary, we held that the Legislature had again overstepped its bounds. *Dorsey v. Gary*, 37 Md. 64 (1872). In that case this Court had rendered decisions with which the Legislature apparently disagreed. The judgments had become final. The Legislature then passed an act empowering the Court to reopen and rehear the cases in which it had already rendered a final judgment. There, as in the present case, counsel argued that the power of the Legislature was predominant. In response, after distinguishing the alleged precedential cases, we held:

"[The present Act] undertakes to confer on this court the power, at its discretion, to annul and set aside its final judgments and decrees, rendered several terms ago upon full hearing and after careful consideration. If such legislation were sustained, there would be no end to controversies.

"By the organic law [the constitutions] of the State it is declared 'that the Legislative, Executive and Judicial powers of the Government ought to be forever separate and distinct form each other; and no person exercising the

functions of one of said departments shall assume or discharge the duties of any other.'—Declaration of Rights, Art. 8.

"It requires no argument to show that such legislation as the Act before us, is contrary to the intent and meaning of this Article, and is an exercise by the Legislature of judicial powers."

*Dorsey,* at 79.

We again attempted to clearly indicate the basis for the creation and maintenance of the separation of powers concept in our case of *Robey v. Commissioners,* 92 Md. 150, 48 A. 48 (1900), a case involving attempts by the Legislature to impose Executive Branch accounting duties on certain of the judges of Maryland. We said then:

"The 8th Art. of the Declaration of Rights ordains: 'That the legislative, executive and judicial powers of government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said departments shall assume or discharge the duties of any other.' Can a Judge, who exercises the functions of the judicial department, be required to assume or discharge the duties which pertain to either of the other departments? The decided cases furnish many illustrations of unsuccessful efforts by the legislative department to exercise judicial functions, and many instances of attempts to confer upon the judicial department duties which were either executive or legislative. CHIEF JUSTICE MARSHALL said in *Wagman [Wayman] v. Southard,* 10 Wheat. [at] 46: 'The Legislature makes, the executive executes and the judiciary construes the law.' The obvious purpose in the division of powers between the departments of government, was to prevent the same officers from exercising over the same subject the functions of legislator, executive and Judge. Such a union of functions would be a menace to civil liberty. There is no difficulty in recognizing a plain infraction of the organic prohibition; but as the act approaches the boarder [sic] line dividing these departments it may not be so easy to determine on which side of that line it belongs.... '... The mere

fact that a Judge is called on by statute to execute a certain function does not make the function a *judicial* function. Its character is dependent on its qualities, not on the mere accident as to the person who has been designated to do it. The qualities of the act and not the character of the actor must determine the nature of the act.' "

*Id.* at 161–62, 48 A. at 50.

We said in *Todd, supra,* a case also involving the attempt by the Legislature to impose non-judicial duties on judges, that:

"In making this inquiry we are not dealing with any question of expediency or policy; nor can we have regard to the question whether, in the particular instance, the Legislature has prescribed a course of proceeding best adapted to the accomplishment of a laudable object. The public policy involved in the inquiry is determined and fixed in our Bill of Rights and the Constitution—the fundamental law; and we are limited to the question of constitutional power. As was said in the case of *Thomas v. Owens,* 4 Md. [189,] 225 [ (1853) ], 'under our system of government its powers are wisely distributed to different departments; each and all are subordinate to the Constitution, which creates and defines their limits; whatever it commands is the supreme and uncontrollable law of the land.' "

97 Md. at 262, 54 A. at 964.

In *Cromwell v. Jackson,* 188 Md. 8, 52 A.2d 79 (1947), we discussed the issue of separation of powers in a situation where the Legislature was again attempting to confer administrative licensing matters on the Judiciary. There we said:

"As Mr. Justice Cardozo said in *Highland Farms Dairy v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 [ (1937) ]: 'How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself.' The Supreme Court in construing the separate powers conferred on the three departments of the Federal Government, which makes the doctrine of separation of powers applicable, has gone very far. . . .

"In *Mitchell v. Wright*, 154 F.2d 924, 928 (C.C.A.5, 1946) Cir. J. Lee said: 'We have several elements with which we may distinguish legislative and judicial functions, to wit: the element of futurity or retrospect, that of generality or particularity, that of discretion, and that of initiation. A good example of the element of discretion is the determination of a legislative body on the basis of public interest. The judiciary will not interfere with this type of discretion. . . .'

. . .

". . . However, when this Court is of opinion that the Legislature has exceeded its authority in placing a non-judicial function on the Court, we should not hesitate in declaring the Act void."

*Id.* at 23–28, 52 A.2d at 86–89 (Some citations omitted).

In holding, among other things, that the Legislature could not confer a *de novo* power upon a jury (and thus upon the Judicial Branch of government) in respect to an administrative function belonging to the Executive Branch, we stated in *Linchester Sand and Gravel Corp.*:

"That aspect of the Constitution which is spotlighted by this case is the fundamental doctrine of separation of powers, a principle expressly or impliedly recognized in the basic law of every state in this nation. This doctrine has long been a cornerstone of this State's concept of government and finds forthright expression in Article 8 of the Declaration of Rights contained in the Constitution of Maryland. Although Maryland's statement of the separation of powers is 'a more concrete barrier than any which the Supreme Court has had to hurdle under the Federal Constitution,' the right of the Legislature to delegate powers to administrative agencies has been recognized in this State for more than 125 years.[46]

---

**46.** The present case does not involve challenges to the Legislature's delegation of its power, but the claim that the Legislature is attempting by legislation to usurp a function of the Executive.

**576**

. . .

"However, this constitutional 'elasticity' cannot be stretched to a point where, in effect, there no longer exists a separation of governmental power, as the Maryland Constitution does not permit a merger of the three branches of our State government, nor does it 'make any one of the three departments subordinate to the other, when exercising the trust committed to it.' When ... any of the three branches of government takes unto itself powers denied to it or those strictly within the sovereignty of another branch, the courts of this State must step in and declare such encroachments to be constitutionally prohibited, not because the court is a 'Triton among minnows' or predominates in dignity, but because, as Chief Justice Marshall, in *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803), in speaking of the federal constitutional system—though just as applicable to our State system—avowed:

'It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

'So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

'If, then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply.' *Id.* [at] 177–78.

. . .

"It was not competent, therefore, for the court to empanel a jury and then in effect instruct it to convert itself into an

administrative body with authority, as if original, to grant or deny a permit. . . . This the Maryland Constitution, which divides the powers of government into three separate branches, neither to usurp the authority of the other, steps forth and forbids."

274 Md. at 218–21, 228, 334 A.2d at 520–21, 525. (Citations omitted.)

In *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), a case concerning the power of the Judiciary to regulate the practice of law, we further discussed the nature and importance of the concept of separation of powers:

"The concept that the rights and liberties cherished by the people of Maryland are best safeguarded by the division of governmental powers into independent and coequal organs is familiar to even a casual student of our constitutional heritage. Although this doctrine is both fundamental to our scheme of government and well known, we believe it important to recall that the 'purpose [of separating the exercise of the sovereign powers][prior brackets in original] was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy.' *Myers v. United States,* 272 U.S. 52, 293, 47 S.Ct. 21, 84, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting). The doctrine of separation of powers was thought by the founding fathers of this State to be of such monumental importance for the continued safekeeping of our freedoms that they specifically incorporated this tenet into the proposed initial Declaration of Rights [Bill of Rights], thereafter adopted as part of the Maryland Constitution of 1776. *See* Maryland Declaration of Rights of 1776, Art. 6. Since that time the expression of this concept has always had a place in our organic law, although its written locution has varied in our later constitutions. . . . This provision has been consistently interpreted from its inception

to parcel out and separate the powers of government, and to confide particular classes of them to particular branches of the supreme authority. That is to say, such of them

as are judicial in their character to the judiciary; such as are legislative to the legislative, and such as are executive in their nature to the executive. Within the particular limits assigned to each, they are supreme and uncontrollable.

. . .

"We have recognized in the past that, in addition to the specific powers and functions expressly granted to the three organs of government by the Constitution, each branch possesses additional powers perforce implied from the right and obligation to perform its constitutional duties.... Indeed, the existence of such powers inheres in the scheme of a written constitution, for without this authority, the document would, by necessity, be but a tome exhaustively cataloging the sole authority of the respective political institutions. Particularly important for the resolution of this case, of course, is what has come to be known as the incidental, implied or inherent power of one branch of government— the judiciary—...."

*Waldron*, at 688–91, 426 A.2d at 933–34 (citations omitted).

While *Waldron* concerned the independence of the Judiciary, its holding would manifestly be at least as protective of the inherent and specified powers and duties of the Executive Branch—and of the Legislative Branch as well.

### 3. Separation of Powers—Appointments and Removals

*Beasly v. Ridout,* 94 Md. 641, 52 A. 61 (1902), was primarily a case where an amendment to the Constitution had given the Legislature the power to take away the operation of jails from the constitutional office of Sheriff. But, when the Legislature acted pursuant to that power, it substituted in the Sheriffs' stead a Board of Visitors who were to be appointed by the Judges of the respective counties. It was this last appointment provision that we held violated the separation of powers provisions of the Maryland Declaration of Rights and Constitution because it imposed a duty on judges to exercise the

appointment power over non-judicial appointees. In that case we noted:

"Officers [Visitors] so appointed [by judges], when once inducted into power, are doubtless regarded as *de facto* officers, and their official acts upheld *pro bono publico.* Their title even may be recognized in proceedings against indifferent parties, necessary to the conduct of the office, but we are aware of no case in which the title of officers so appointed has been sustained in a proceeding like the present seeking to oust an incumbent, who but for the Act in question, must be conceded to be the lawful incumbent. The rule of physics is the rule of law, that no stream can rise higher than its source, and an Act which violates a constitutional provision cannot confer valid title upon one whose title is traced to, and must depend upon, the very feature of the Act which renders it obnoxious to that charge. This Court has said ... that 'when the Court is satisfied that the Legislature has exceeded its authority, we should no more falter in denouncing the Act as void, than we should hesitate in deciding the most unimportant matter within our jurisdiction."

*Beasly,* 94 Md. at 660, 52 A. at 66 (citation omitted) (emphasis added).

While most of the early cases were either attempts by the Legislature to impose non-judicial duties on judges or to usurp judicial functions, there is also a case involving attempts by the Legislature to confer legislative powers on the Executive Branch. In a case also involving the status of State employees, we held unconstitutional an Act of the Legislature because it conferred power on the Governor to add persons to the merit system that had been created by the Legislature. We said in *Ahlgren v. Cromwell,* 179 Md. 243, 17 A.2d 134 (1941):

"What this section does, if valid, is ... to give the Governor the power to recognize and follow it, or to repeal it at his pleasure; in other words, so far as [the Act] is concerned, grant to the executive power to legislate. It was a legislative act to adopt the provision for the appointment of the

watchmen; it requires action by the Legislature to repeal or amend it, and we have not been shown, nor do we find, that this has been done.... To enforce [this section of the Act] would be a violation of the Declaration of Rights."

*Id.* at 246–47, 17 A.2d at 136 (citations omitted).

*Murphy v. Yates,* 276 Md. 475, 348 A.2d 837 (1975), has some similarities with one of the specific issues in the case *sub judice. Murphy* involved the attempt by the Legislature to create the office of State Prosecutor as " 'an independent unit in the executive branch ... for administrative purposes only....'" *Id.* at 476, 348 A.2d at 838. The Act required that the Special Prosecutor be nominated by a Commission created by the Act. The Commission would be required to nominate three names and one of those names had to be appointed by the Governor for a fixed term, subject to confirmation by the Senate. The State prosecutor was empowered by the Act to independently investigate alleged violations of certain prescribed laws. Upon the finding by the State Prosecutor of an alleged criminal violation the State's Attorney of the relevant jurisdiction would have 45 days to commence prosecution and if he did not, the State Prosecutor could prosecute.

The Commission that was to nominate the State Prosecutor included the Chief Judges of the Court of Appeals, Court of Special Appeals, and the District Court, all *ex officio,* the President of the Maryland Senate, the Speaker of the House of Delegates and others. The trial court ruled that the provisions requiring the Chief Judges to be *ex officio* members were unconstitutional, but that some of the remaining sections were constitutional and severable. We were asked, among other issues, to address the constitutionality of having judicial officers participate in the appointment process.

Section 10 of Article II, which provides for the Governor's powers of appointment contains similar language to that contained in the section of the Constitution being interpreted in *Murphy, supra.* Section 10 provides: "He [the Governor] shall nominate, and, by and with the advice and consent of the Senate, appoint all civil and military officers of the State,

whose appointment, or election, is not otherwise herein provided for, *unless a different mode of appointment be prescribed by the Law creating the office.*" (Emphasis added). At the time of the creation of the Public Service Commission, and at the time the current members were appointed, there was no other *mode of appointment* that was created by the Public Service Commission Act.

As previously noted, Section 15 of Article II of the Maryland Constitution provides in relevant part: "The Governor ... may remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years." It is clear that in the present case the Governor did not remove any of the members of the current Commission for any reason. It is also clear that the Legislature has attempted to exercise by statute that power which the Constitution expressly confers on the Governor. We went on to say in *Murphy:*

> "The rule which can be distilled from the cases is essentially this. If an office is created by the Constitution, and specific powers are granted or duties imposed by the Constitution, although additional powers may be granted by statute, the position can neither be abolished by statute nor reduced to impotence by the transfer of duties characteristic of the office to another office created by the legislature. We regard this as but another facet of the principle of separation of powers, guaranteed by Article 8 of Maryland's Declaration of Rights...."

276 Md. at 492, 348 A.2d at 846 (citations omitted).

The case of *Commission on Medical Discipline v. Stillman,* 291 Md. 390, 435 A.2d 747 (1981), included three separate appeals by a doctor whose license to practice medicine had been revoked by an administrative agency. It involved several constitutional issues, including issues relating to the separation of powers. Maryland Code (1957, 1980 Repl.Vol.), Art. 43, § 130(a) delineated the membership of the Commission to be the President of the Medical and Chirurgical Faculty of the State of Maryland, and other members were to be appointed

by the Secretary of Health and Mental Hygiene from lists submitted to him by the Chirurgical Faculty, several other members to be selected by the head of an administrative department of State Government and others.

After addressing other issues, we addressed the doctor's argument that the appointment process contained in the statute unconstitutionally removed " 'the Governor's right to make executive branch appointments,' presumably in contravention of Art. II, § 1 of the Maryland Constitution which vests the 'executive power of the State . . . in a Governor.' " *Stillman*, at 408, 435 A.2d at 757. We noted:

"In *Davis*,[47] the question was whether, under this constitutional provision, the legislature could provide for appointment to an office created by statute. Concluding that it could, the Court said:

'[W]e think this provision [Art. II, § 11] means, simply, that the Governor shall have the power to fill all offices in the State whether created by the Constitution or by Act of Assembly, unless otherwise provided by the one or the other. When, therefore, the legislature has created an office by Act of Assembly, the legislature can designate by whom and in what manner the person who is to fill the office shall be appointed.' *Id.* at 161.

"In *[Mayor of] Baltimore*,[48] the Court reconciled the interpretation in *Davis* with the separation of powers provision contained in the Declaration of Rights. In answer to the contention that the power of appointment was 'an intrinsic executive function,' beyond the legislature's authority, the Court observed:

'[T]he Legislature makes the laws, the Judiciary expounds them, and the Governor sees that they are faithfully executed. . . . It does not follow, as a necessary conclusion, that, in order to perform this duty, [the Governor] must have agents of his own nomination. Our form

---

47. *Davis v. State,* 7 Md. 151 (1854).

48. *Mayor of Baltimore v. State,* 15 Md. 376 (1860).

of government, in its various changes, has never recognized this power as an executive prerogative.' 15 Md. at 456.

"The Court in *[Mayor of] Baltimore* said that the Constitution 'so far from treating ... [the appointment power] as an inherent executive power, indicates that it belongs where the people choose to place it.' *Id.* at 457.

. . .

"... It is thus clear that when the legislature creates an office by statute ... the separation of powers provision of Article 8 does not of itself prevent the legislature from placing the power of appointment in the hands of someone other than the Governor. As stated in *Scholle*,[49] when the legislature has created an office by statute, it 'can designate by whom, and in what manner the person who is to fill the office shall be appointed.' 90 Md. at 743, 46 A. 326.... We need not probe the limits of the *Scholle* doctrine in this case, for we are satisfied that placing the appointment authority [where the statute placed it] does not offend the separation of powers provision of the Maryland Declaration of Rights." *Stillman*, at 409–12, 435 A.2d at 757–58. We upheld the legislative scheme applicable in *Stillman*.

In the present case there are two provisions of the statute that have been placed at issue. One terminates the terms of the present members of the Commission. In layman's terms it fires them. This was an unconstitutional act by the Legislature.

Another provision creates a new method of appointment of the Commission members, via nomination by a Legislative entity, but only for one term. If the Governor fails to appoint from the list nominated, the statute contains a fall back position that the Legislature's leaders may then, themselves, make the appointments. Under our holdings in *Stillman, Baltimore, Scholle* and *Davis,* it is clear that if it is done

---

49. *Scholle v. State,* 90 Md. 729, 46 A. 326 (1900).

properly, i.e., abolishment or actual reconstruction of the Commission and the provisions of the statute originally authorizing it, the appointment process prospectively may be placed in the hands of persons other than the Governor. This, however, is not what occurred in the case *sub judice.*

*Maryland Classified Employees Association v. Schaefer,* 325 Md. 19, 599 A.2d 91 (1991), *cert. denied,* 502 U.S. 1090, 112 S.Ct. 1160, 117 L.Ed.2d 407 (1992), involved a claim by state employees that "the Governor usurped the plenary power of the General Assembly and exercised a legislative function" in setting the number of work hours that would constitute a work week for most State employees. *Id.* at 28, 599 A.2d at 95. In upholding the lower court's action which had confirmed the power of the Governor, we noted: "He [the trial judge] further said that, as head of the Executive Branch of government, the Governor was authorized to direct and supervise the officers of that branch, including the Secretary of Personnel who serves at his pleasure." *Id.* The court then stated: "As we have already observed, the Governor, as the head of the Executive Branch, has broad powers with respect to Executive Branch State employees...." *Id.* at 34, 599 A.2d at 98.

We have held, however, that the Legislature can by express provision in a prospective statute commit the appointment process to entities other than the Executive. Over one hundred and forty years ago,[50] this Court answered the question as to whether when creating by legislation a subordinate governmental entity with appointed members, the Legislature could provide that such members be appointed by a process in which the Executive was not involved. In *Mayor of Baltimore v. State,* 15 Md. 376 (1860), we affirmed that the Legislature may create methods of appointment for' entities which it creates by legislation which do not involve the Governor. We reiterated:

---

**50.** This was prior to the adoption of the present Constitution in 1867. The language we found most relevant in *Mayor of Baltimore, infra,* survived in the 1867 Constitution.

"The Constitution of 1776, contained the first portion of the Article in our present Constitution, yet it devolved on the Legislature the election of the Governor and Council, and on the Executive the appointment of judges, and, in certain contingencies, of officers connected with the judiciary. It also provides for the appointment of other officers.... A[ ] departure is observable in the union of the Senate and the Governor, in making appointment to office.

. . .

"On this Article the relators insist, that it authorizes the appointment by the Legislature, because it confers on the executive the appointment of all officers, not otherwise provided for, *'unless a different mode of appointment be prescribed by the law creating the office,'* and that, as the law in question creates the office, the designation of the Commissioners in the Act is within the intent and meaning of the Constitution; to which it is answered on the part of the respondents, that this section gives the Legislature, in creating an office, power only to prescribe the mode of appointment, and can by no legitimate rule of construction be interpreted to grant the power of legislative appointment. It is conceded that the Legislature was not under any obligation to confer the power of appointment on the executive.... In the absence of any such requirement of the Legislature, we do not perceive that they were under a duty to make such delegation [to the people] of the appointing power."

*Id.* at 460 (emphasis added). As relevant here, we have never overruled our decision in *Mayor of Baltimore* that, when creating entities not established by the Constitution, the Legislature need not involve the Governor in the appointment process.

Notwithstanding some of the commentators' reservations about the use of federal cases in the interpretation of state separation of powers issues, we will briefly discuss one of the Supreme Court cases most closely related to the issues presented for our review. That Court has addressed the separa-

tion of powers principle on a number of occasions. *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), *Bowsher v. Synar*, 478 U.S. 714, 736, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583 (1986); *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

In relation to the appointment and removal of Executive officers, the Supreme Court, in *Bowsher*, held that the "Gramm–Rudman–Hollings Act" codified as 2 U.S.C. § 901 et seq. was unconstitutional. *Bowsher*, 478 U.S. at 736, 106 S.Ct. at 3193, 92 L.Ed.2d 583. The Court stated:

> "The critical factor lies in the provisions of the statute defining the Comptroller General's office relating to removability. Although the Comptroller General is nominated by the President from a list of three individuals recommended by the Speaker of the House of Representatives and the President *pro tempore* of the Senate, see 31 U.S.C. § 703(a)(2), and confirmed by the Senate, he is removable only at the initiative of Congress. He may be removed not only by impeachment but also by joint resolution of Congress 'at any time'. . . . "

*Bowsher*, 478 U.S. at 727–28, 106 S.Ct. at 3189, 92 L.Ed.2d 583 (footnotes omitted). In arriving at its conclusion, the Court explained the implied separation of powers principle as it applies under the federal constitution and how it affects the power of the Legislative Branch to remove appointed officers:

> "We noted recently that '[t]he Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.' *INS v. Chadha*, 462 U.S. 919, 951[, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317] (1983). The declared purpose of separating and dividing the powers of government, of course, was to 'diffus[e] power the better to secure liberty.' *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635[, 72 S.Ct. 863, 870, 96 L.Ed. 1153] (1952) (Jackson, J., concurring). Justice Jackson's words echo the famous warning of Montesquieu, quoted by James Madison in The Federalist

No. 47, that "there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates".... The Federalist No. 47, p. 325 (J. Cooke ed.1961).

"Even a cursory examination of the Constitution reveals the influence of Montesquieu's thesis that checks and balances were the foundation of a structure of government that would protect liberty. The Framers provided a vigorous Legislative Branch and a separate and wholly independent Executive Branch, with each branch responsible ultimately to the people. The Framers also provided for a Judicial Branch equally independent with '[t]he judicial Power ... extend[ing] to all Cases, in Law and Equity, arising under this Constitution, and the Laws of the United States.' Art. III, § 2."

*Bowsher*, 478 U.S. at 721–22, 106 S.Ct. at 3185–86, 92 L.Ed.2d 583. The Court further stated:

*"The Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts.* The President appoints 'Officers of the United States' with the 'Advice and Consent of the Senate....' Art. II, § 2. Once the appointment has been made and confirmed, however, the Constitution explicitly provides for removal of Officers of the United States by Congress only upon impeachment by the House of Representatives and conviction by the Senate. An impeachment by the House and trial by the Senate can rest only on 'Treason, Bribery or other high Crimes and Misdemeanors.' Art. II, § 4. A direct congressional role in the removal of officers charged with the execution of the laws beyond this limited one is inconsistent with separation of powers."

*Bowsher*, 478 U.S. at 722–23, 106 S.Ct. at 3186, 92 L.Ed.2d 583 (emphasis added).

The Court then pointed to two other cases for the proposition that Congress was not allowed to participate in the removal process, other than by impeachment:

588

"This Court first directly addressed this issue in *Myers v. United States,* 272 U.S. 52[, 47 S.Ct. 21, 71 L.Ed. 160] (1926). At issue in *Myers* was a statute providing that certain postmasters could be removed only 'by and with the advice and consent of the Senate.' The President removed one such Postmaster without Senate approval, and a lawsuit ensued. Chief Justice Taft, writing for the Court, declared the statute unconstitutional on the ground that for Congress to 'draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power ... would be ... to infringe the constitutional principle of the separation of governmental powers.' *Id.,* at 161, 47 S.Ct., at 40.

"A decade later, in *Humphrey's Executor v. United States,* 295 U.S. 602[, 55 S.Ct. 869, 79 L.Ed. 1611] (1935), relied upon heavily by appellants, a Federal Trade Commissioner who had been removed by the President sought backpay. *Humphrey's Executor* involved an issue not presented either in the *Myers* case or in this case—*i.e.,* the power of Congress to limit the President's powers of removal of a Federal Trade Commissioner. 295 U.S., at 630[, 55 S.Ct. at 874–875]. The relevant statute permitted removal 'by the President,' but only 'for inefficiency, neglect of duty, or malfeasance in office.' Justice Sutherland, speaking for the Court, upheld the statute, holding that 'illimitable power of removal is not possessed by the President [with respect to Federal Trade Commissioners].' *Id.,* at 628–629[, 55 S.Ct., at 874]. The Court distinguished *Myers, reaffirming its holding that congressional participation in the removal of Executive officers is unconstitutional.* Justice Sutherland's opinion for the Court also underscored the crucial role of separated powers in our system:

'The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these

departments by the Constitution; and in the rule which recognizes their essential co-equality.' 295 U.S. at 629–630[, 55 S.Ct., at 874].

. . .

"In light of these precedents, we conclude that Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment. *To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws.* As the District Court observed: 'Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.' 626 F.Supp., at 1401. The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess [the right of removal].

". . . To permit an officer controlled by Congress to execute the laws would be, in essence, to permit a congressional veto [over Executive branch operations]. *Congress could simply remove, or threaten to remove, an officer for executing the laws in any fashion found to be unsatisfactory to Congress.* This kind of congressional control over the execution of the laws, *Chadha* makes clear, is constitutionally impermissible.

"*The dangers of congressional usurpation of Executive Branch functions have long been recognized.* '[T]he debates of the Constitutional Convention, and the Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches.' *Buckley v. Valeo,* 424 U.S. 1, 129[, 96 S.Ct. 612, 687, 46 L.Ed.2d 659] (1976). Indeed, we also have observed only recently that '[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.' *Chadha, supra,* 462 U.S., at 951[, 103 S.Ct., at 2784]."

*Bowsher,* 478 U.S. at 724–27, 106 S.Ct. at 3187–88, 92 L.Ed.2d 583 (footnote omitted) (some emphasis added).

The final words of the Supreme Court on the constitutionality of the removal clause in *Bowsher* are helpful in our analysis:

> "[A]s *Chadha* makes clear, once Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation. *Chadha,* 462 U.S. at 958[, 103 S.Ct. at 2787–2789]. By placing the responsibility for execution of the Balanced Budget and Emergency Deficit Control Act in the hands of an officer who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act and has intruded into the executive function. The Constitution does not permit such intrusion."

*Bowsher,* 478 U.S. at 733–34, 106 S.Ct. at 3191–92, 92 L.Ed.2d 583.

There is no dispute in the case at bar as to the nature of the creation of the Commission. It was created by statute and expressly placed by the statute in the Executive Branch of government and, thus, is neither a Constitutional nor a Legislative office. The Legislature however, retains the power to abolish it and to specify its duties and responsibilities so long as in the process the Legislature does not usurp the powers of, or grant improper powers to, the other branches of Government. In other words it can act—if it acts properly.

█ At oral argument the State argued that the Constitutional provision that grants power to the Governor to remove civil officers is not exclusive because it does not expressly prohibit the Legislature from removing the particular Executive Branch officers. Because the Legislature (according to the State) has plenary power,[51] it can do virtually anything it

---

51. The State cites several cases in support of the Legislature's "plenary" power. *See Harvey v. Marshall,* 389 Md. 243, 884 A.2d 1171 (2005) (judicial review of administrative agency action); *State v. Bd. of Ed.,*

wants to do in respect to firing any civil officer (presumably all State employees including merit system employees) by merely changing the respective statute, regardless of what the Constitution expressly confers upon the Executive.

As we have indicated, generally, under the express separation of powers requirements of our State Constitution, it is provided that the Governor "shall nominate, and, by and with the advise and consent of the Senate, appoint all civil ...

---

346 Md. 633, 642, 697 A.2d 1334, 1338 (1997) ("judicial review of adjudicatory administrative decisions may not constitutionally be precluded when those decisions 'impair personal or property rights.'" Legislature retains control of municipal corporations); *First Continental Sav. & Loan Ass'n v. Director, State Dep't of Assessments & Taxation,* 229 Md. 293, 183 A.2d 347 (1962) (referenda/emergency bills); *Md. Comm. for Fair Representation v. Tawes,* 228 Md. 412, 440, 180 A.2d 656, 671 (1962) (reapportionment—"But, the Courts do have the power and authority to restrain the potency of actions of the coordinate branches of the government"); *Wyatt v. Beall,* 175 Md. 258, 264, 1 A.2d 619, 621 (1938) (legislative interpretation of "organic" law, i.e., the Constitution, entitled to presumption); *Brawner v. Supervisor,* 141 Md. 586, 119 A. 250 (1922) (Legislature has no power under the Constitution to pass legislation subject to approval of voters); *McMullen v. Shepherd,* 133 Md. 157, 104 A. 424 (1918) (Act of Legislature found unconstitutional.); *Beasly v. Ridout,* 94 Md. 641, 52 A. 61 (1902); *Trustees Catholic Cathedral Church v. Manning,* 72 Md. 116, 19 A. 599 (1890) (Constitution did not prohibit the legislative act); *Mayor of Baltimore v. State,* 15 Md. 376 (1860), *supra;* and *Rochow v. Md. Nat'l Capital Park & Planning Comm'n,* 151 Md.App. 558, 827 A.2d 927 (2003).

In *Brawner, supra,* we made a statement that has perhaps led subsequent eras to misconstrue our use of "plenary" to describe the power of the Legislature. We said: "The Legislature is perhaps the most important department of the State's government. It possesses the most extensive and even plenary powers *of law making,* and it is restrained and limited only by the State and Federal Constitutions." *Brawner,* at 603, 119 A. at 255 (emphasis added). Apparently, this language in the 85 years since, has been seized on to assert that the Legislature has plenary powers, *generally.* That original statement merely referred to the Legislature's primary function in respect to the passing of legislation, not that it had some kind of power over the other branches of government that enabled it to impose its will on them in violation of the Constitution and Declaration of Rights.

We have considered all of these cases in our review of the law. Whatever the extent of the Legislature's "plenary" power, it is subordinate to the "organic" law of this State—the Maryland Constitution. When the provisions of the Constitution are violated, the "plenary" power, if any, of the Legislature must yield.

officers of the State ... unless a different mode of appointment be prescribed by the Law creating the office." Md. Const. art. II, § 10. There is no dispute among the parties that the current members of the Commission were nominated by the (or a) Governor and that all were confirmed (by the assent) of the Senate. The issue presented here is primarily whether the Legislature may terminate or fire non-constitutional Executive Branch employees by the simultaneous "repeal/re-enactment" process.[52] The State asserts that the absence of an express prohibition forbidding the Legislature to terminate Executive Branch officials, establishes an implied power of the Legislature to terminate such officials. The Framers expressly provided for the power of removal. They did not confer it on the Legislative Branch; they conferred it on the Executive. Nothing remains to be implied. Here the only relevant changes as to Sections 12 and 22 of Senate Bill 1 do not, in effect, abolish or restructure the Executive Branch administrative agency, except to terminate the present duly appointed and confirmed members of the Commission and to provide for a different method of appointment of the interim replacements.

The early constitutional history of the Governor's removal power, under what is now Article II, § 15 of the Constitution, was discussed in the case of *Cull v. Wheltle,* 114 Md. 58, 78 A. 820 (1910). The case involved the power of the Governor to suspend an officer, pending proceedings to remove him.[53] There we discussed the removal power under the various Maryland Constitutions:

"The primary question is: 'Had the Governor the power, under the Constitution and laws of this State, to suspend these officers, pending the proceedings to remove them on the charges and complaints of incompetency and misconduct in office?'

---

**52.** This action was undertaken by the Legislature *after* assenting to and confirming the appointments of the present Commissioners.

**53.** The officials involved were members of the Police Commissioners of Baltimore City.

. . .

"Section 15 of Article 2 of the Constitution is: 'The Governor may *suspend* or arrest any military officer of the State for disobedience of orders or other military offense; and may *remove* him in pursuance of the sentence of a Court Martial; and may *remove* for incompetency or misconduct all civil officers who received appointment from the executive for a term of years.'

"That language of itself must be admitted to be at least suggestive, for when the same section authorized the Governor to '*suspend* or arrest' a military officer for the causes given, and to *remove* him in pursuance of the sentence of a court-martial, and then, when it deals with civil officers, only authorizes him to '*remove*' them, the maxim '*expressio unius est exclusio alterius*' [to include one thing implies the exclusion of the other, or of the alternative] naturally suggests itself. There is no other power of removal of these officers expressly given to the Governor, either by the Constitution or by statute, and there is not only no express power of suspending them given him, but a striking contrast is made between his powers in reference to military officers and those concerning civil officers. . . .

. . .

" . . . The express power to *suspend* was thus left out of the Constitution of 1851, and it was likewise omitted in those of 1864 and 1867.

"If the framers of those three Constitutions had intended that the Governor should not only have the power to *remove* civil officers, for incompetency or misconduct, but also to *suspend* them . . . it is impossible to understand why they should deliberately have omitted the term 'suspend.'. . . .

. . .

"If the people of the State of Maryland, who framed the Constitution through their representatives and then by their votes ratified it, are to be judged by their actions, they have

unmistakably declared that it is not their will that those occupying important public offices be deprived of them, merely because they are *charged* with incompetency or misconduct. It is not in accord with the spirit that has characterized the people of Maryland at least since 1851 to say, that one deemed worthy by the Governor and Senate of Maryland of a high and important office is to be even temporarily deprived of it, before he is convicted by the tribunal which they, through the organic law, or their representatives in the Legislature, have said shall give him a fair and impartial trial. Far better would it be to possibly suffer some occasional inconvenience, or loss to the State by reason of the incompetency or even misconduct of some public official, than to subject one believed to be worthy of election or appointment to the mortification and indignity of being even temporarily removed, merely because charges are preferred against him, for it is useless to suggest that an officer is not seriously injured in both his individual and official capacities by a suspension from office, although he may be eventually acquitted of the charges against him. "... JUDGE MCSHERRY said, in *Miles v. Stevenson,* 80 Md. 358, 30 A. 646: 'It is the utmost stretch of arbitrary power and a despotic denial of justice to strip an incumbent of his public office and deprive him of its emoluments and income before its prescribed term has elapsed, except for legal cause, alleged and proved, upon an impartial investigation after due notice.' "

*Id.* at 78–85, 78 A. at 821–23.

While the discussion in *Cull* concerned an implication (the power of suspension) that a Governor was attempting to engraft onto a constitutional provision, and the present circumstances are somewhat different, both situations involve the same provision of the Constitution. The Maryland Constitution grants the power to the Governor to remove for incompetency or misconduct those officers appointed by him for a term of years. This is the removal power *expressly conferred* by the Maryland Constitution. If the framers desired to cause the removal power as to officers appointed by the

Governor for a term of years to be shared by the Legislative Branch they knew how to do so. They did so with the appointment process. Article II, § 10 provides in relevant part, "He [the Governor] shall nominate, and, by and with the advice and consent of the Senate, appoint all civil . . . officers of the State, whose appointment, or election, *is not otherwise herein provided for, unless a different mode of appointment be prescribed by the Law creating the office.*"

The emphasized language of Section 10 is nowhere found in Section 15, although it is clear that the constitutional framers who used the emphasized language in Section 10, obviously knew how to create executive powers subject to approval by the Legislative Branch or subject to change by statute enacted by the Legislative Branch. They did not include such a provision in Article II, § 15 of the Maryland Constitution. In the circumstances of Section 15—the creation of the power in the Governor with no mention of the Legislature, acts under the maxim, "*expressio unius est exclusio alterius*," to exclude the Legislature from sharing the removal power of the Governor at least as to those officers appointed by the Governor for a term of years.[54]

We are unwilling to interpret the absence of a specific prohibition forbidding the Legislature to remove Executive Branch officials to be the granting of an implied power to the Legislature to do that which the Constitution expressly confers on the Executive Branch. This is especially so when the act—in this case the removal of Executive Branch officials—is generally inherent in the character of an Executive Branch function.

As can be seen from our discussion, we have on numerous occasions since 1776 prohibited the conferring of non-judicial

---

**54.** We do not address the removal powers, if any, of the Governor except in the context of Art. II, § 15. We also do not resolve whether the Legislature has any power at all to remove Executive Branch officers even via impeachment as to those officers not specifically made subject to impeachment by the Constitution. That issue is not before us.

powers on the Judiciary by the Legislature. As jealously as we have guarded against the granting of administrative and legislative powers to the courts, we have the duty to protect all of the branches of government from granting power to, or seizing power from, each other when such a grant or seizure is in violation of the separation of powers, either implied or as expressed in our explicit constitutional framework. Certainly, this issue is fraught with friction between the Executive and Legislative branches, but, a desire for friction is one of the reasons the concept was created in the first instance.

We hold that the power to remove officers appointed by a Governor, during the term of the officers' appointment, for misconduct or incompetency, is solely the Governor's and the attempt by the Legislature to terminate those officers, previously appointed by the Governor and approved by the Senate, prior to the expiration of their terms of office, was an usurpation of executive power in violation of Article II, §§ 1, 9 and 15 of the Maryland Constitution and in violation of Article 8 of the Declaration of Rights of Maryland.

The General Assembly retains (and it always has) the power to decline to consent to the re-appointment of the members of the Commission and has the power to prospectively change the membership and the appointment processes in respect to the Public Service Commission, but it had no power to fire the members, even by a statute. In attempting to do so the Legislature is exercising an executive power. Acting by legislation does not make the matter legislative in nature—if it is an executive function (firing officials of the Executive Branch) it remains an executive function. If this were not so the Legislature would have the power to legislate the other two branches of Maryland's government out of existence. This would clearly violate the provisions of the Maryland Constitution and Declaration of Rights that we have discussed. The provisions of Senate Bill 1, Section 12, prematurely terminating the terms of the Commissioners of the Public Service Commission, are null and void.

In respect to the provisions of Senate Bill 1, as they relate to the Legislature's involvement prospectively in the appointment process for the proposed new interim Commissioners, it would ordinarily be incumbent upon the Court to determine if the Legislature acted properly in creating a new method of appointment. Because the removal provisions of Senate Bill 1 exceeded the Legislature's constitutional powers, and are null and void, there are no vacancies to fill (except as to a member who may have resigned). As Senate Bill 1 was written, the different provisions including the Legislature in the appointment process only related to the immediate replacement successors of the Commissioners the Bill sought to terminate. The Bill was crafted as a one time process relating only to the termination of these Commissioners and the process for replacing them, after which all provisions of the appointment process that pre-dated Senate Bill 1 were to automatically return.[55] The appointment process of the Maryland Constitution, Art. II, § 10, contains a clause "unless a different mode of appointment be prescribed by the Law creating the office," and the termination provision of the Maryland Constitution does not. Article II, § 15, as relative to civil officers simply provides that: "The Governor ... may remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years." It is absolutely silent on any other mode of termination.[56]

---

**55.** This provision of "return" to the Act as it was before, further convinces the Court that, as to the provisions being challenged in this case, the primary, if not sole, reason for the passage of the Section 12 of the Act was to fire, i.e., "remove," the Commissioners because of the Legislature's disapproval of their actions while in office. This is little more than a Legislative attempt to supervise Executive Branch officials. As such, it is also in violation of Article II, § 1 of the Maryland Constitution.

**56.** Interestingly, if the temporary appointment process contained in Senate Bill 1, Section 22 were to be upheld, a question may well arise that if Governor Ehrlich declines to appoint from the list of nominees submitted to him by the Legislative Branch, and, instead, the Senate President and the Speaker of the House appoints them: Can the Governor later suspend or remove the members for incompetency or misconduct (they would not have "received" their appointments from

This Court has long recognized that the Legislature may, *in a proper manner,* effectively terminate the tenure of civil officers not having a fixed Constitutionally-set term. If the General Assembly chooses to abolish or reconstitute the Public Service Commission or any other statutory board or commission, it is competent to do so, even if the effect of that abolition or reconstitution would be the shortening or ending of existing terms of incumbent members. The Legislature has not abolished or reconstituted the Commission, however. It has left the Commission essentially intact and has instead

---

him)? Could anybody remove or suspend them if the Governor declined to make their appointments and they were appointed by others? The Constitution confers no express power on the President of the Senate or the Speaker of the House to terminate Executive Branch employees; it confers no express power on the Legislature to terminate public officials, nor, unlike the Federal Constitution which specifically provides in Article II, Section 4 that "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment ... [,]" does the Maryland Constitution specifically mention which officers are subject to impeachment except as to the Governor, Lt. Governor (Art. II, Sec.7) and judges (Art. IV, Section 7).

The impeachment power in Maryland first appeared in the Constitution of 1851 and the debates of that time do not make clear whether, beyond the officials above mentioned, the power was to be applicable to other public officials. To the extent that the powers of impeachment might be applicable to other public officials (and we do not here make any determinations on that point) there would have to be formal charges filed against the official sought to be impeached in the House of Delegates. The House of Delegates would then have to pass Articles of Impeachment (the equivalent of an indictment) of the official by a majority vote. The impeachment would then have to be tried in the Senate of Maryland. Before the trial commenced, every member of the Senate would have to be placed under oath to do "justice according to the law and evidence." It would then take a two-thirds vote of all elected members of the Senate to convict. Art. III, Section 26 of the Maryland Constitution. None of this was done in the case *sub judice.*

It is clear that removal of Executive Branch officials would not, generally, be considered a function of the Legislative Branch absent an express constitutional provision.

Another question may well arise. If the Governor declines to make the appointments from the list submitted by the Legislature and the appointments are made by the presiding officers of the Legislature, who supervises the appointees, the Governor under his powers to supervise Executive Branch employees or does the Legislature have some sort of constitutional power to supervise employees of the Executive Branch who are not officials or employees of the General Assembly?

ended the terms of the five incumbents and effectively precluded the incumbent Governor from reappointing them by requiring that his appointees be from a list submitted by the Legislature. That presents issues not presented in an abolition or restructuring of the agency, issues that arise from Article 8 of the Declaration of Rights and Article I, § 1 of the Maryland Constitution.

Article 8, which has been part of our Constitution since 1776 and relatively shortly thereafter amended, provides that ". . . the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." In allocating power among the three branches, Article II, § 1 provides that "[t]he executive power of the State shall be vested in a Governor. . . ."

We have held that the power to appoint Executive branch officials is not entirely an executive function committed exclusively to the Governor and that the Legislature may provide for a different method of appointment. If, however, as the Attorney General opined at oral argument in support of the legislative action at issue here, it is within the province of the General Assembly to fire any or every gubernatorial Executive Branch appointee not having a fixed Constitutionally-set term of office and without any restructuring of the agencies or offices, proceed itself to appoint the replacements for all of those Executive officials, to serve at its pleasure or the pleasure of its agent, the Legislature could very effectively emasculate the Governor's Constitutional duty, authority, and ability to execute the laws. It could, as a result, create a parliamentary form of Government, which Article 8 of the Declaration of Rights and Article II, § 1 of the constitution prohibit.

The Legislature has not, of course, gone that far in this case. It has merely fired all of the incumbent Commissioners of but one Executive Branch agency, taken control over the method of appointment of their immediate replacements, and returned the general appointment power to the next Governor.

The authority asserted for it to do that, however, if recognized by this Court, would permit a much more pervasive, almost Cromwellian, intrusion as well. The Constitutional brake on that must therefore serve as a brake on this. The Legislature is free, if it wishes, to abolish or restructure the Public Service Commission, even if that causes the incumbent Commissioners to lose their offices. In restructuring the agency, it may provide a method of appointment other than by the Governor; it may provide for different terms; it may provide for additional or different qualifications for the office; and it may provide for additional or different duties for the agency. What it may not do is to leave the agency more or less intact and simply fire the gubernatorial appointees it does not like by prematurely ending their terms and immediately replacing them with its own choices. If it has the power to do that, it has the power to make the Governor a mere cypher, which the Constitution does not contemplate or permit.

Judge Battaglia's dissent also goes to great length to discuss the "checks and balances" aspect of the separation of powers concept of government. The dissent fails utterly to recognize that the application of those principles is exactly what is occurring here.

Madison in *The Federalist Papers: No. 48* discusses the issue of checks and balances, stating in a part relevant to the present situation:

> "... It is agreed on all sides, that the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments. It is equally evident, that none of them ought to possess, directly or indirectly, and overruling influence over the others, in the administration of their respective powers. *It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.*
>
> . . .
>
> The legislative department is everywhere extending the sphere of its activity, and drawing all power into its impetu-

ous vortex .... But in a representative republic, where the executive magistracy is carefully limited; both in the extent and the duration of its power; and where the legislative power is exercised by an assembly, which is inspired, by a supposed influence over the people, with an intrepid confidence in its own strength; which is sufficiently numerous to feel all the passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions, by means which reason prescribes; *it is against the enterprising ambition of this department that the people ought to indulge all their jealously and exhaust all their precautions.... Its [the Legislature's] constitutional powers being at once more extensive, and less susceptible of precise limits, it can, with the greater facility, mask, under complicated and indirect measures, the encroachments which it makes on the coordinate departments....* " (Emphasis added.)

Then discussing the experience in Virginia, Madison notes:

"... 'It will be no alleviation, that these powers will be exercised by a plurality of hands, and not by a single one. One hundred and seventy-three despots would surely be as oppressive as one.... An ELECTIVE DESPOTISM was not the government we fought for; but one which should not be founded on free principles, but in which the powers of the government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually *checked and restrained by the others....*' " (Emphasis added.)

After discussing Pennsylvania's experience, Madison concludes:

"The conclusion which I am warranted in drawing from these observations is, that a mere demarcation on parchment of the constitutional limits of the several departments, is not a sufficient guard against those encroachments which lead to a tyrannical concentration of all the powers of government in the same hands."

It is clear from Madison's writings, that he foresaw the need for the respective branches of government to check the encroachments of the other branches, an exercise that we have here undertaken to restrain the encroachments of one branch on the powers of the Executive Branch.

Finally, in respect to the dissent's discussion of Legislative motives we note that, a primary issue in the case is whether the Legislature was restructuring the agency or whether it was actually firing the Commissioners, thus encroaching on the Executive Branch's function. In such an instance, the legislative history of the enactment must, of necessity, be examined. We do not question the motives of the Legislature, we merely restate what the Legislature and its counsel states were its motives. There is really no dispute as to why the Legislature did what it did. We merely acknowledge, not question, its motives.

## IV. Conclusion

For reasons we have expressed elsewhere in this opinion, the provisions of Senate Bill 1, Section 12, changing the method of appointment of *prospective* members of the Commission, if any vacancy exists on the Public Service Commission, might not ordinarily violate Maryland's separation of powers doctrine in that the Maryland Constitution permits "modes" of appointment other than by the Governor, and we have found no express Constitutional limitation that would restrict the Senate's pre-nomination participation in selecting a list for consideration for membership in agencies it creates, nor the participation of the presiding officers to make prospective appointments if the Governor declines to appoint members from the list.

As we have held above, however, the attempt by the General Assembly to terminate, "remove," the incumbent members of the Public Service Commission is null and void as an unconstitutional usurpation of the removal power granted to the Governor under the provisions of Article II, § 15 of the Constitution of Maryland and is further null and void as being in violation of Article II, §§ 1 and 9 of the Maryland Constitu-

tion and as being contrary to the provisions of Article 8 of the Maryland Declaration of Rights, which provides that the respective Departments of government are to be "forever separate and distinct" and that no person "exercising the functions of one of said Departments shall assume or discharge the duties of any other." Accordingly, with our resolution of this issue, it necessarily follows that the provision in Section 22 that attempts to delegate legislative power to the Attorney General to "terminate" the members of the Commission is also unconstitutional, null and void.

We do not address the other provisions of Senate Bill 1 as they were not presented to this Court in this case. Because Senate Bill 1 contains a severability clause, the provisions of that Bill that can operate within the parameters of this opinion remain in effect.

The Commissioners in office on and prior to June 30, 2006 (other than members who may have resigned), remain the Commissioners of the Public Service Commission until, and if, terminated by the Governor under the provisions of Article II, § 15 of the Maryland Constitution, or until their terms in office expire. The Circuit Court's denial of injunctive relief is reversed.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH INSTRUCTIONS TO RENDER A DECLARATORY JUDGMENT AND PERMANENT INJUNCTION CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**

WILNER, J., concurs in judgment.

WILNER, J, concurs.

It is neither customary nor helpful for the Court to file four opinions in a case. This is, however, a rare and extraordinary case, in which the Court is required to determine whether one Branch of the State Government has unlawfully usurped the Constitutional authority of another. In enacting Senate Bill 1 (2006 Md. Laws, Special Session, ch. 5), the General Assembly,

for policy reasons it thought important, has allegedly intruded upon the ability of the incumbent Governor to execute the laws of the State, which, under Article II, §§ 1 and 9 of the Maryland Constitution, it is his Constitutional prerogative and duty to do, and assumed some of that authority for itself.

The issue before the Court, though politically charged, is entirely a legal one—whether the General Assembly has the Constitutional authority to do what it did. The issue goes to scope and meaning, in a 21st Century context, of an 18th Century doctrine that has been part of the organic law of this State since 1776 and that is still recognized as an essential pillar of our Constitutional Democracy, and it is not surprising that the judges of the Court have some differing views as to how that doctrine plays out in a modern and more complex world.[1]

I join the judgment of the Court and I agree with much of what Judges Cathell and Harrell have said in their respective opinions, one or the other of which Chief Judge Bell and Judges Raker and Greene have joined. For the reasons they state, I believe that Judge Battaglia is incorrect in her view that an appeal does not lie from the denial of a temporary restraining order, and, in light of Article XVII, §§ 5 and 9 of the Constitution, she is probably wrong as well in assuming or suggesting that members of the Public Service Commission

---

1. Judge Cathell has recounted in some detail the historical evolution of the separation of powers concept, its acceptance as a core element of 18th Century political philosophy, and, in particular, its critical role in the development of American Constitutional government, and there is no need to repeat what he has said. It is important to stress, however, that the marvelous articulation of that doctrine in Article 8 of the Maryland Declaration of Rights—"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other"—is not an anachronism. The encroachment of Government into the private lives of citizens is far more pervasive now than it was in 1776, and, if anything, there is greater need now than there was then to preclude any Branch of Government from usurping power allocated to another Branch and thereby assuming a predominance and aggregation of power that the Constitution does not allow.

are not civil officers, although, because I do not believe that Article II, § 15 is implicated in any telling manner, I do not regard that error as significant in this case. I also cannot accept Judge Battaglia's apparent conclusion that Article 8 provides no effective Constitutional restraint upon the Legislature's effort to assume absolute control over the removal and replacement of incumbent Executive Branch officers. If the General Assembly has the Constitutional power to do what it has done in §§ 12 and 22 of Senate Bill 1, we would, indeed, have the legal foundation for a parliamentary form of Government, which is not what Article 8 allows.

I differ from Judge Cathell only in that I would rest the decision solely on the basis of Article 8 of the Declaration of Rights and Article II, §§ 1 and 9 of the Constitution. I do not believe that the first part of § 12 of Senate Bill 1—ending prematurely the terms of the incumbent members of the Public Service Commission—of itself violates Article II, § 15 of the Constitution. I differ from Judge Harrell in that I do not think that we can so neatly parse § 12, finding the firing of the incumbent Commissioners to be valid but not the method of their replacement. It is the entirety of the legislative assault that runs afoul of Article 8. It may well be that if the General Assembly had done no more than end the terms of the incumbents and direct the Governor to appoint new members, subject to Senate confirmation, there would be no Constitutional problem, but the firing and replacement provisions in § 12 of Senate Bill 1 are so locked together that, despite a severance clause in the statute, they really cannot, in my view, be separated in light of an Article 8 challenge.

I agree entirely with Judges Cathell and Harrell that the Legislature, if it chose, could abolish or reconstitute the Public Service Commission (or any other statutory board or commission), even if the effect of doing so would be the premature ending of existing terms of incumbent members, and, as part of any reconstitution of the Commission, it could alter the method of appointment. The Legislature has not abolished or reconstituted the Commission, however. It has left the Commission essentially intact but simply ended the terms of the

incumbent Commissioners and sharply curtailed the power of the Governor to appoint their successors. That creates issues not presented in an abolition or restructuring of the agency, issues that most clearly implicate, and in my view run afoul of, Article 8. If the Legislature has the Constitutional authority to do what it has done in §§ 12 and 22 of Senate Bill 1, it can, indeed, as Judges Cathell and Harrell point out, erode to the point of impotence the ability of the Governor to discharge his responsibilities under Article II, §§ 1 and 9 of the Constitution. For these reasons, I join the judgment announced by Judge Cathell.[2]

RAKER and HARRELL, JJ., concur and dissent.

Judges HARRELL and RAKER concur and dissent as follows.

Although there is much in Judge Cathell's, Judge Wilner's, and Judge Battaglia's opinions that is commendable, we find ourselves unable to join fully any of them. This is because we conclude that, while the Legislature possesses the power to modify the terms of service of the incumbent members of the Public Service Commission (PSC) so as to terminate their service as of 30 June 2006, it went too far when, in fashioning an ad hoc and utterly novel appointment procedure to govern solely the selection of the immediate successors to the incumbents (which process would be abandoned for future appointments, as the terms of the immediate successors' terms expire or they otherwise depart office, at which time the traditional gubernatorial appointment/Senate consent process, as was previously the case, would resume for future appointments to the PSC), the Legislature essentially fashioned a "contingent strawman" role for the Governor in what essentially is a mock

---

**2.** I share the concern expressed by Judge Cathell that, given the limited scope of the issues presented by the parties, which go only to membership of the Commission, the Court's judgment may well create some very significant difficulties, by reason of other provisions in Senate Bill 1, in terms of the authority of the incumbent Commissioners to perform the statutory duties assigned to them. We cannot resolve those difficulties in this case; the issues are simply not before us.

gubernatorial appointment process. This process violates, in our view, Article 8 (Separation of Powers) of the Maryland Declaration of Rights.[1]

As to the portions of SB–1–2006 challenged in the present litigation, we would affirm the Circuit Court's order as to the unlikelihood of success regarding Appellant(s)' claims as to Section 12(1), but reverse as to the balance of Section 12 and Section 22 in its entirety. This would leave the provisions of Md.Code, Public Utility Companies (PUC) Article, § 2–102, as amended by SB–1–2006, Section 1, which is unchallenged here, to govern the Governor's appointment and the Senate's confirmation of "open field" successor-nominees to the ousted incumbent members of the Public Service Commission.

We are unpersuaded by the analysis in Judge Cathell's majority opinion for the Court which concludes that the Legis-

---

1. It is not entirely clear, however, that a declaration as to Article 8 was sought by Appellant(s) in the complaint. The complaint does not mention Article 8 in its averments (*see* especially prayer for relief "D," seeking a declaration that Sections 12 and 22 of SB–1–2006 violate Art. 24 of the Maryland Declaration of Rights, Art. II, § 15 of the Maryland Constitution, and Art. I, § 10 of the U.S. Constitution. In prayer for relief "E" of the complaint, Appellant(s) generically sought a declaration that Sections 12 and 22 of SB–1–2006 "are illegal, ultra vires, and of no legal face and effect." Judge Matricciani's 28 June 2006 order denying Appellant(s)' motion for a temporary restraining order (TRO) likewise does not mention Art. 8 of the Declaration of Rights in its analysis, although it concludes that Appellant(s) were not likely to succeed on the merits of the complaint because §§ 12 and 22 of SB–1–2006 "do[ ] not run afoul of the federal constitution's dictates on separation of powers...." Given the complaint's relevant invocation of only Art. I, § 10 of the U.S. Constitution, we understand Judge Matricciani's analysis to reflect a conclusion as to that contention only. Finally, neither Appellant(s) nor Appellee, in their briefs to this Court, list Art. 8 of the Maryland Declaration of Rights in their Table of Authorities in support of their respective arguments. Despite our concern whether Art. 8 has been put in play in this litigation by the parties or the Circuit Court's opinion and order under review, Judge Cathell's majority opinion for the Court, Judge Wilner's concurrence, and Judge Battaglia's dissent engage in analyses of its application to Sections 12 and 22 of SB–1–2006. Perhaps this is because analysis of Art. II, § 15 of our State Constitution necessarily compels consideration of Art. 8 as well. In any event, we also shall express a view as to the Art. 8 implications.

lature's modification of the terms of office of the incumbent PSC members violates Article II, §§ 1, 9, and 15 of the Maryland Constitution. SB–1, and specifically § 12(1), does not assign to that modification any underlying legislative motive regarding the incumbents' performance in office insofar as incompetency or misconduct are concerned. The Court should not be concerned properly with legislative motive in any event, only the effect of the legislation. The Majority, however, looks to the motive or purpose of the General Assembly, and concludes that the purpose of Section 12(1) of S.B.1 was to remove the current members of the PSC. From this assumption, the Majority concludes that the Legislature "fired them." Maj. op. 394 Md. at 546–47, 907 A.2d at 191. The Majority then reasons that, because under the Act the Legislature fired the Commissioners, S.B.1, Section 1 violated "express provisions of the Maryland Constitution, including, but not limited to, Section 8 of the Maryland Declaration of Rights and Article II, §§ 1, 9, and 15 of the Maryland Constitution, and in the process denying to the Appellant(s) due process of law." *Id.* at 566–67, 907 A.2d at 203.

The Majority's entire reasoning rests upon this proposition. The Legislature, however, did not *fire* or *remove* the Commissioners. The Majority's conclusion collapses, therefore, because it concedes that the Legislature has the power to abolish, create, and restructure. The Majority holds that:

"[t]he power to remove officers appointed by a Governor, during the term of the officers' appointment, for misconduct or incompetency, is solely the Governor's and the attempt by the Legislature to terminate those officers, previously appointed by the Governor and approved by the Senate, prior to the expiration of their terms of office, was an usurpation of executive power in violation of Article II, §§ 1, 9, and 15 of the Maryland Constitution and in violation of Article 8 of the Declaration of Rights of Maryland."

*Id.* at 596, 907 A.2d at 220.

Clearly, the Legislature may shorten or lengthen the term of office of a non-constitutional employee. The only way the Majority may reach the conclusion that the Legislature fired

these Commissioners is to examine the motive [2] of the General Assembly in enacting the legislation, something that this Court plainly is not permitted to do in these circumstances. The motive of the Legislature in enacting legislation is not a proper subject for judicial examination.[3] *See e.g., Workers' Compensation Commission v. Driver,* 336 Md. 105, 118–19, 647 A.2d 96 (1994); *Mayor & City Council of Baltimore v. State,* 15 Md. 376, 461 (1860); *Cf. County Council for Montgomery County v. District Land Corp.,* 274 Md. 691, 337 A.2d 712 (1975).

Seeded within Judge Cathell's majority opinion are the reasons for our belief that the Legislature properly may modify the terms of office of the Commissioners in this instance. The Commission, for its very existence, sprang in 1910 (Chp. 180, Laws 1910) wholly and fully formed from the brow of the Legislature. No constitutional mandate for its creation existed. Although operating, and later formally denominated, as an "independent" Executive Branch agency (Chp. 8, Sec. 2, Laws of 1998), the Commission and its responsibilities were subject, over the years, to periodic re-

---

2. Motive and intent are different. The distinction aptly was set out in *Glen Cove Theatres, Inc. v. City of Glen Cove,* 36 Misc.2d 772, 773, 233 N.Y.S.2d 972, 974 (1962)):

"In the field of legislation, motive and intent have different connotations. . . . The former may be defined as the impelling force of reason which induces action and precedes it. The latter signifies the intendment and meaning of the enactment, the purpose it seeks to accomplish, its construction, all as gathered from the text of law itself, legislative studies, etc."

3. Excluded generally from this rule are equal protection cases involving racial discrimination. After *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 563–66, 50 L.Ed.2d 450 (1977), courts recognize that a legislative enactment may be challenged on the basis of invidious intent if plaintiff alleges racial discrimination. "It is equally clear, however, that the [U.S.] Supreme Court and lower federal and state courts will not always show the same receptivity to claims of impermissible motive when constitutional principles other than racial equality are at issue." Alan E. Brownstein, ILLICIT LEGISLATIVE MOTIVE IN THE MUNICIPAL LAND USE REGULATION PROCESS, 57 U.Cin.L.Rev. 1(1988).

invention by the Legislature, including not infrequent tinkering with the terms of office of the Commission members (*see* Chp. 474, Laws 1949; Chp. 756, § 2, Laws 1976; Chp. 729, Laws 1980). From time to time, the Legislature also modified the general qualifications prescribed for eligibility of individuals for appointment to the Commission. *See* Chp. 441, Laws 1955; Chp. 756, § 3, Laws 1976. From the creation of the Commission in 1910 until 1975, the Legislature was content to permit the Governor to appoint individuals to the Commission, without an overt and specific legislative approval requirement, subject only to each individual meeting the prescribed general eligibility prerequisites mentioned in the statute. In 1975, however, the Legislature injected into the statutory scheme, for the first time, a requirement that each individual appointed by the Governor to the Commission must receive the post-nomination approval of the Senate before assuming his or her office. At no time, however, during the long history of the Commission has the Legislature, until now, purported to require the Governor to make appointments to the Commission, by a truncated date certain, exclusively from a short list of specifically named individuals, selected by the leadership of the Legislature [4] (referring to the Legislature's determination that no person in the list of 10 requires subsequent Senate consent, i.e., they were pre-approved), or risk losing altogether the opportunity to make the appointments and defaulting that duty to one or another array of the Speaker of the House of Delegates and the President of the Senate, or the Attorney General. This Frankenstein-like [5] appointment process is all the more remarkable because the Legislature, while proclaiming that the Commission at all times remained an "indepen-

---

4. As opposed to a delegation to a non-governmental professional association, relevant to the field of endeavor regulated by the affected agency, to fashion a list of possible appointees from which the Executive Branch was obliged to select members. *See Commission on Medical Discipline v. Stillman,* 291 Md. 390, 435 A.2d 747 (1981).

5. "Frankenstein-like" only in the sense that the process was constructed from odd parts and animated for a brief time only to die a certain death.

dent" Executive Branch unit of government, in the same breath effectively held out the singularity of the temporary appointment process contemplated by §§ 12 and 22 of S.B. 1 as a one-time only action and, after a new Commission is selected according to the temporary requirements, business would resume as usual for future Commission appointments.

Section 12  (1) of SB–1–2006 facially is precisely what the Legislature did in 1949, by Chp. 474, when it terminated the terms of the then-Commissioners as of 1 June 1949 and re-set the new staggered terms to apply prospectively.  The only relevant difference between the 1949 action and S.B. 1–2006, Sec. 12(1) is that in 1949 the Governor was not precluded in tandem from reappointing incumbents (which it appears is exactly what he did-*see* maj. op. 394 Md. at 537, 907 A.2d at 185–86).  This situation repeated itself in 1976 (*see* maj. op. 394 Md. at 538–39, 907 A.2d at 186).

We associate ourselves with much of the reasoning in that part of Judge Battaglia's dissent discussing *Mayor and City Council of Baltimore v. State*, 15 Md. 376 (1860) (dissent op. 394 Md. at 625–27, 907 A.2d at 238–39).  The appointment process to an Executive Branch agency governing body is neither inherently nor exclusively associated with the Governor as an executive prerogative where the agency is entirely a creation of the Legislature, unrestrained by relevant constitutional limitation.  Thus, as was iterated in *Commission on Medical Discipline v. Stillman*, 291 Md. 390, 409–411, 435 A.2d 747, 757–758 (1981), discussing *Baltimore* and its progeny, "[w]here the office is of legislative creation, the Legislature can modify, control or abolish it. . . ." (Citing *Davis v. State*, 7 Md. 151 (1854)).  What the Legislature chose to do here regarding the terms of office fits properly and historically as an allowable modification of the office of commissioner of the PSC.

The Legislature, by creating an "independent" Executive Branch unit of government, but where it facially purports to maintain an ostensible appointment power in the Governor, nonetheless may revisit periodically the methodology of the appointment process, alter the organic hierarchical structure of the unit (which it did not purport to do in S.B.1), prescribe

general and specific eligibility requirements for appointees, retain consent approval as to the appointees, and determine (from time to time) what the terms of office for appointees ought to be; HOWEVER, it should not be understood to possess the power to limit the Governor's consideration to a short list of specific persons handpicked by the leadership of the Legislature itself from which the Governor must make the appointments, within an arbitrary and unreasonably short time, or risk losing the power of appointment, without further legislative enactment. The Legislature here effectively precluded the incumbent Governor from reappointing the incumbent commission and required that his appointees be from a list submitted by the Legislature. That presents issues not presented in an abolition or restructuring of the agency, issues that implicate at least Article 8 of the Declaration of Rights, as Judge Cathell points out (maj. op. 394 Md. at 598–99, 907 A.2d at 222). Judge Cathell's analysis, however, following that observation, goes too far.

If it is within the province of the General Assembly, without any organic restructuring of the agencies or offices, to proceed to appoint the replacements for all Executive officials for which it properly may have terminated service, to serve at its pleasure or the pleasure of its agent, *then* the Legislature effectively would emasculate the Governor's Constitutional authority and responsibility. If permitted, the Legislature indeed will have created a parliamentary form of Government, as Judge Cathell and Judge Wilner decry and which Article 8 of the Declaration of Rights prohibits.

The Legislature, as Judge Cathell notes (maj. op. 394 Md. at 599–600, 907 A.2d at 222–23), has not gone that far in this case. It took control, however, over the method of appointment of the immediate replacements of the incumbent commissioners of one Executive Branch agency, only to return the traditional appointment power to the next Governor. The authority asserted for it to do that, however, if recognized by this Court as Judge Battaglia urges, would permit much more pervasive intrusions. To forestall that, we would draw the line that the General Assembly may not replace the incumbent commissioners with its own choices, while maintaining a sham

appointment power in the incumbent Governor. If it has the power to do that, it has the power to make the Governor a mere hand puppet, which Art. 8 does not contemplate or permit.

We do not subscribe to the reasoning in Judge Battaglia's dissent (dissent op. 394 Md. at 614–15, 907 A.2d at 231–32) that the refusal to issue the TRO is not immediately appealable. Maryland Rule 15–501(c) defines a "temporary restraining order" as "an injunction granted without opportunity for a full adversary hearing on the propriety of its issuance." Thus, denial of a TRO is a denial of injunctive relief within the meaning of § 12–203 of the Courts & Judicial Proceedings Art. of the Maryland Code.

Moreover, we do not associate ourselves with Judge Battaglia's dissent regarding whether members of the PSC are "civil officers" within the meaning of Art. II, § 15 of the Maryland Constitution (dissent op. 394 Md. at 614–18, 907 A.2d at 231–34). As Judge Cathell's opinion explains (maj. op. 394 Md. at 548–50, 907 A.2d at 192–93), *School Com'rs v. Goldsborough,* 90 Md. 193, 44 A. 1055 (1899) was decided before the addition to the Constitution in 1922 of Article XVII. Section 5 of that Article limits Article II, § 13 by providing that all officers appointed by the Governor hold office for the terms fixed by law, which may be greater or lesser than two years. Section 9 of Article XVII provides that, in the event of a conflict between Article XVII, Article XVII prevails. The problem solved by the *Goldsborough* decision has not existed since 1922. There is no longer any reason or need to give the term "civil officer" such an artificially narrow definition. The term "civil officer" should be given its normal meaning as any officer other than a military officer. Members of the Public Service constitute civil officers within the meaning of Article II, § 15.

In summary, we would affirm that portion of Judge Matricciani's 28 June 2006 order which denied a TRO as to enforcement of Section 12(1) (terminating the incumbent Commissioners as of 30 June 2006) of S.B.–1–2006 on the ground that it was unlikely that Appellant(s) could succeed on the merits of their claims. As to the remainder of Judge Matricciani's order, however, we would reverse and hold that Appellant(s)

claims likely would be successful that the balance of Section 12 and the entirety of Section 22 (the appointment process for the immediate successors to the incumbents) of S.B.–1–2006 are unconstitutional as violative of State constitutional separation of powers principles.

BATTAGLIA, J., dissents.

BATTAGLIA, J.

I respectfully dissent.

The majority interprets Sections 1, 9 and 15, Article II of the Maryland Constitution in conjunction with the language of Article 8 of the Maryland Declaration of Rights and holds that an appeal from a denial of a temporary restraining order is appropriate,[1] that members of the Public Service Commission

---

1. The majority posits that a denial of a temporary restraining order is appealable under Maryland Code (1974, 2002 Repl.Vol.), Section 12–303(3)(iii) of the Courts and Judicial Proceedings Article by superimposing the definition of temporary restraining order in Rule 15–501(c) to the statute. That juxtaposition is erroneous; we cannot confer the right to appeal upon ourselves, because as we have held, "the right of appeal is entirely dependent upon statutes." *State v. Green*, 367 Md. 61, 76, 785 A.2d 1275, 1284 (2001); *Id.*, 785 A.2d at 1284 ("[Q]uestions of appealability have today become entirely governed by statutes."), overruling *Cardinell v. State*, 335 Md. 381, 644 A.2d 11 (1994). *See also State v. Manck*, 385 Md. 581, 597, 870 A.2d 196, 205 (2005); *Mateen v. Saar*, 376 Md. 385, 399, 829 A.2d 1007, 1015 (2003); *Pack Shack, Inc. v. Howard County*, 371 Md. 243, 247–49, 808 A.2d 795, 797 (2002).

   The Supreme Court has interpreted 28 U.S.C. § 1292, which is the counterpart of Section 12–303(3)(iii) of the Courts & Judicial Proceedings Article, *see Funger v. Mayor of Somerset*, 244 Md. 141, 149–50, 223 A.2d 168, 173 (1966) (stating that Maryland Code (1957), Section 7 of Article 5 making certain interlocutory orders appealable-which would later become Maryland Code, Section 12–303 of the Courts & Judicial Proceedings Article—"has a counterpart" in 28 U.S.C. § 1292), and acknowledged that a denial of a temporary restraining order is not appealable. *Office of Pers. Mgmt. v. Am. Fed'n of Gov't Employees, AFL–CIO*, 473 U.S. 1301, 1303–04, 105 S.Ct. 3467, 3468, 87 L.Ed.2d 603, 605 (1985). Other federal courts have recognized only one exception to the nonappealability, that being if the denial of the temporary restraining order effectively disposes of the litigation. *See Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 572 (6th Cir.2002) (acknowledging that denial of motion for temporary restraining order is not appealable unless "it is tantamount to a ruling on a preliminary

("PSC") are "civil officers" within the meaning of Section 15, and erroneously abrogates the centuries old doctrine of "checks and balances" which this Court, from the time of Article II's inception, has recognized to be a part of our organic law which has defined the prerogatives and parity of the Legislative and Executive branches in Maryland. More specifically, the majority ignores the settled Maryland constitutional principle, set forth in several opinions by the Court, that the appointment and removal of statutory officers is not intrinsically or inherently an executive function, and is entirely subject to the authority of the General Assembly.

The majority assumes that the PSC Commissioners are "civil officers" within the meaning of Section 15, Article II of the Maryland Constitution. In fact, under our jurisprudence, it is highly doubtful that the PSC Commissioners are civil officers for purposes of Section 15.[2]

---

injunction"); *First Eagle Sogen Funds, Inc. v. Bank for Int'l Settlements,* 252 F.3d 604, 607 (2d. Cir.2001) (noting that denial of motion for temporary restraining order is not appealable unless the order "effectively disposes of the litigation"); *Duvall v. Keating,* 162 F.3d 1058, 1062 (10th Cir.1998) (observing that denial of motion for temporary restraining order is not appealable unless appellant will suffer irreparable harm absent immediate review "and 'might have a serious, perhaps irreparable, consequence' "); *Hunt v. Nat'l Broadcasting Co.,* 872 F.2d 289, 292 (9th Cir.1989) (stating that denial of motion for temporary restraining order is not appealable unless it effectively decides the merits of the case); *Robinson v. Lehman,* 771 F.2d 772, 782 (3d Cir.1985) (stating that denial of motion for temporary restraining order is not appealable unless it "decides the merits of the case or is equivalent to a dismissal of the claim").

2. Inclusion of the portion of oral argument regarding the abolition of the Court of Special Appeals and the removal of its judges on pages 530–32, 907 A.2d 181–82 of the majority opinion is provocative. The dialogue is misleading because it incorrectly suggests that the Legislature may not only have the power to abolish the Court of Special Appeals but also to remove the judges sitting thereon. While the Legislature could abolish the Court of Special Appeals, Maryland Constitution Section 14A, Article IV ("The General Assembly may by law create such intermediate courts of appeal, as may be necessary."), it could not remove the judges from office because the judges, through the Constitution, are protected from legislative removal, with the exception of impeachment. Maryland Constitution Article IV, Section 4 ("Any Judge shall be removed from office by the Governor, on conviction in a

The leading case with regard to whether an individual is a "civil officer" or "public officer" under Section 15, Article II of the Maryland Constitution is *Board of County School Commissioners of Worcester County v. Goldsborough*, 90 Md. 193, 44 A. 1055 (1899). In *Goldsborough*, this Court was asked to determine whether a county school commissioner was subject to removal by the Governor for incompetence or misconduct under Section 15, Article II of the Maryland Constitution. The dispositive question the Court addressed was whether the commissioners were "civil officers" within the provisions of Section 15, Article II of the Maryland Constitution, the same constitutional provision with which we grapple in this case. Initially, we evaluated the term "civil officer" in the context of Section 13, Article II of the Maryland Constitution, which at the time provided that "all civil officers appointed by the governor and senate . . . except in cases otherwise provided for in this constitution, shall . . . continue for two years." *Id.* at 202, 44 A. at 1056. Because the school commissioners were appointed to six-year terms, adopting a two-year criteria would mean that the Governor could remove the commissioners at any time, because they were not constitutionally protected. *Goldsborough*, 90 Md. at 202, 44 A. at 1056. To avoid this conundrum, we chose to define civil officers for the purposes of Section 15 of Article II as "government agents" who had to be vested individually with a portion of the state's sovereignty. *Id.* at 207, 44 A. at 1058–59 ("It was manifestly not the purpose of the Legislature to confer upon the school

Court of Law, of incompetency, of wilful neglect of duty, misbehavior in office, or any other crime, or on impeachment, according to this Constitution. . . ."); Maryland Constitution Article IV, Section 5A(d) ("The continuance in office of a judge of the Court of Special Appeals is subject to approval or rejection by the registered voters of the geographical area prescribed by law at the next general election following the expiration of one year from the date of the occurrence of the vacancy which he was appointed to fill, and at the general election next occurring every ten years thereafter."); Maryland Code (1974, 2002 Repl.Vol.) Section 1–701 of the Courts & Judicial Proceedings Article ("A judge's salary may not be diminished during his continuance in office."). Therefore, the graphic suggestion that the Legislature could terminate the employment of the judges on the Court of Special Appeals is without foundation.

commissioners, as individuals, the powers, or to impose upon them, personally, the duties, which in explicit terms, and by the use of exact language, the General Assembly committed to boards that were called into corporate existence expressly to conduct the school system.... [W]e hold that a school commissioner is not a civil officer....").

Although our Constitution has been amended, effectively eliminating the two-year requirement, *see* Maryland Constitution Sections 5 and 13, Article 17, as the majority recognizes, *Goldsborough's* definition of civil officer under Section 15 of Article II as an individual who must personally exercise the state's sovereign power has been acknowledged and reaffirmed by this Court even after the constitutional changes. *See, e.g., Nesbitt v. Fallon,* 203 Md. 534, 544, 102 A.2d 284, 288 (1954) (stating that exercising sovereign power is "the most important characteristic of a public office"), quoting *Buchholtz v. Hill,* 178 Md. 280, 283, 13 A.2d 348, 350 (1940) ("The most important characteristic of a public office, as distinguished from any other employment, is the fact that the incumbent is entrusted with a part of the sovereign power to exercise some of the functions of government for the benefit of the people." (citing *Goldsborough, supra*)). In 1963, this Court clearly reaffirmed *Goldsborough* in *Howard County Metropolitan Commission v. Westphal,* 232 Md. 334, 193 A.2d 56 (1963), by stating:

> The essential question in *Goldsborough* was whether or not a member of a board of county school commissioners was a civil officer subject to removal by the Governor under § 15 of Article II of the Constitution. The holding was that a school commissioner was not such an officer. Insofar as the reasoning in that case rested on the premise that a member of a school board is not a civil officer because he could exercise the power of the board only as a member thereof and not as an individual, we think the reasoning should not be extended so as to apply to the meaning of the term 'office of profit, created by the Constitution or Laws of this State,' as used in Article 35 of the Declaration of Rights, which is

the constitutional provision with which we are here concerned.

*Westphal,* 232 Md. at 340–41, 193 A.2d at 60. We continue to recognize *Goldsborough's* efficacy. Despite any constitutional amendments that may have vitiated the concerns raised in *Goldsborough,* the primary characterization of a civil officer in its holding is abiding; a civil officer must individually exercise the sovereign power of the state.

In the case *sub judice,* the PSC Commissioners do not have individual power to exercise the state's sovereignty; the PSC is the entity given the power to act under the Public Utility Companies Article. Maryland Code (1998), Section 2–101 of the Public Utility Companies Article. Comparable to the *Goldsborough* "corporate" board of school commissioners, the individual PSC Commissioners cannot act unless the PSC is convened. Therefore, under our jurisprudence, the PSC Commissioners are not civil officers under Section 15, Article II of the Maryland Constitution.

The majority's greatest foible, however, is in its treatment of the primary issue before this Court, whether the enactment of Senate Bill 1, by which the Legislature removed the PSC Commissioners, constituted an encroachment by the Legislature on the gubernatorial powers enumerated in Sections 1, 9 and 15, Article II of the Maryland Constitution, and a violation of Section 8 of the Declaration of Rights' separation of powers.[3]

---

**3.** Furthermore, the motives for the Legislature's action in enacting Senate Bill 1 are questioned by the majority opinion. *See, e.g.,* ("Senate Bill 1 and the proceedings during which it was enacted, make clear that the primary focus of the Bill was to remove members of the Public Service Commission."); (The General Assembly's decision to terminate the current Commissioners was purely for the purposes of controlling or supervising the Commission it created as an Executive Branch agency."); ("[T]he primary, if not sole, reason for the passage of the Section 12 of the Act was to fire, i.e., 'remove,' the Commissioners because of the Legislature's disapproval of their actions while in office."). This Court has previously determined that it is improper to consider what we perceive to be the Legislature's motivations when assessing constitutionality. *See Mayor of Baltimore v. State,* 15 Md. 376, 461 (1860) ("[W]hile the motives of the Legislature can have no

Aristotle's principles, explored by John Locke, and later pragmatically structured by Baron de Montesquieu, are generally credited as the mainstay of the separation of powers doctrine. Edward Rubin, *The Myth of Accountability and the Anti–Administrative Impulse*, 103 Mich. L.Rev.2073, 2093 n. 59 (2005) (recognizing that the American government's three distinct branches originate from a fusion of concepts found in Aristotle's *The Politics*, John Locke's *The Second Treatise of Government*, and Montesquieu's *The Spirit of Laws* ); Jim Rossi, *Dual Constitutions and Constitutional Duels: Separation of Powers and State Implementation of Federally Inspired Regulatory Programs and Standards*, 46 Wm. & Mary L.Rev. 1343, 1371 n. 96 (2005) (observing that the traditional theory of separation of powers originated from the writings of John Locke and Montesquieu). *See* M.J.C. Vile, *Constitutionalism and the Separation of Powers* 134 (2d ed., Liberty Fund 1967) ("Locke and Montesquieu provided the intellectual ammunition by which the separation of powers could be advanced as a principle more fundamental than that of mixed government."); Fletcher M. Green, *Constitutional Development In The South Atlantic States, 1776–1860: A Study in the Evolution of Democracy*, 81 (DaCapo Press 1971) (1930) ("Montesquieu had formulated the doctrine [of separation of powers].... The people accepted these views and believed that, unless the legislative, executive, and judicial powers were separated ... there could be no political liberty."); Dan Friedman, *Tracing the Lineage: Textual and Conceptual Similarities in the Revolutionary–Era State Declarations of Rights of Virginia, Maryland, and Delaware*, 33 Rutgers L.J.

---

effect upon the efficiency of the laws, neither can they be regarded by the judiciary when testing their power to pass them."). *See also Pack Shack, Inc.*, 377 Md. at 71, 832 A.2d at 179–80 (2003) ("[G]enerally courts adhere to the familiar principal of constitutional law that [a] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.") (quoting *Renton v. Playtime Theatres Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29, 38 (1986), quoting in turn *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672, 683 (1968) (internal quotation marks omitted)).

929, 988 (2002) ("Historians generally credit Montesquieu for developing and promoting the concept of the separation of powers."). *See also Dep't of Transport. v. Armacost,* 311 Md. 64, 77–78, 532 A.2d 1056, 1062 (1987) ("Steeped in the political theories of Montesquieu and Locke, those who framed the constitutions of our states and of the federal government believed that separating the functions of government and assigning the execution of those functions to different branches was fundamental to good government and the preservation of civil liberties."); *Mayor of Baltimore, supra,* at 472 (Le-Grand, C.J., concurring) ("[I]n the true sense of Montesquieu, in this [State], as in each of the other States of the confederacy, the powers of government have been parceled out to be exerted by separated and distinct departments."); *Crane v. Meginnis,* 1 G. & J. 463, 476 (1829) (noting that Article VI's mandate that the powers of the legislative, executive and judicial branches be separate and distinct was adopted from Montesquieu's *The Spirit of Laws* ).

In Montesquieu's treatise, *The Spirit of Laws,* first published in English just twenty-eight years prior to the adoption of Maryland's Declaration of Rights,[4] he depicted a government consisting of three distinct branches of government: the legislature, which was to enact, amend, or abrogate the law; the executive, which was to execute the law; and the judiciary, which was to punish criminals and determine disputes between individuals. 1 Baron de Montesquieu, *The Spirit of Laws* 181.

To preserve the integrity of the these distinct branches, Montesquieu favored a government in which each respective branch's powers remained separate from the powers of the other two:

> When the legislative and executive powers are united in the same person, or in the same body or magistrates, there can be no liberty;  because apprehension may arise, lest the

---

4. *The Spirit of Laws* was first published in 1748, *see* Vile, *supra,* at 131. Maryland adopted its Declaration of Rights on November 3, 1776. Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis in 1774, 1775, & 1776, at 310.

same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner.

Again, there is no liberty, if the power of judging be not separated from the legislative and executive powers.

*Id.*

A facet of Montesquieu's vision of the separation of powers was his recognition that the legislative branch is the closest to and most representative of the people:

As in a free state, every man who is supposed a free agent, ought to be his own governor; so the legislative power should reside in the whole body of the people. But since this is impossible in large states, and in small ones is subject to many inconveniences; it is fit the people should act by their representatives, what they cannot act by themselves. The inhabitants of a particular town are much better acquainted with its wants and interests, than with those of other places; and are better judges of the capacity of their neighbors, than of that of the rest of their countrymen. The members therefore of the legislature should not be chosen from the general body of the nation; but it is proper, that, in every considerable place, a representative should be elected by the inhabitants.

*Id.* at 183–84.

This delineation of these three branches of government is but one aspect of the separation of powers doctrine. Integral to this doctrine is a powerful system of "checks and balances," whereby the legislative and executive branches are vested with power sufficient to "check" the other branch's powers in order to maintain their separation. Montesquieu envisioned that:

[t]he legislative body being composed of two parts, one checks the other, by the mutual privilege of [annulling a resolution taken by another]. They are both checked by the executive power, as the executive is [checked] by the legislative.

*Id.* at 189. The executive "checks" the legislature through such means as controlling the timing and duration of its

assemblage and the power to veto legislative acts, while the legislature would have the ability to check the executive by "examining in what manner its laws have been executed." He contended that, only by a series of "checks" on the respective branches' powers could their separation be maintained. Matthew P. Bergman, *Montesquieu's Theory of Government and the Framing of the American Constitution*, 18 Pepp. L.Rev. 1, 19–20 (1990).[5]

---

5. Many of the checks proposed by Montesquieu are embodied today in Maryland's Declaration of Rights and Constitution. *See, e.g.,* Md. Decl. of Rights Art. 7 (providing that the people's right to participate in the Legislature is the foundation of free government, and is secured by free and frequent elections); Md. Const. Art. 2, § 16 (granting the Governor the power to convene the Legislature, or just the Senate, in times of emergency, and when the Legislature's safety is in question, to move the Legislature to a safer location); Md. Const. Art. 2, § 17 (granting the Governor the power to veto legislative acts, and the Legislature the power to over-ride the Governor's veto). *See also* Md. Decl. of Rights Art. 1 ("Government ... originates from the People ... and they have, at all times, the inalienable right to alter, reform or abolish their Form of Government"); Md. Decl. of Rights Art. 29 ("[S]tanding Armies are dangerous to liberty, and ought not to be raised, or kept up, without the consent of the Legislature."); Md. Decl. of Rights Art. 34 ("[A] long continuance in the Executive Departments of power or trust is dangerous to liberty; a rotation, therefore, in those departments is one of the best securities of permanent freedom."); Md. Decl. of Rights Art. 35 ("[N]o person shall hold, at the same time, more than one office of profit, created by the Constitution or Laws of this State."); Md. Const. Art. 2, § 6 (granting the Legislature the power to declare Governor or Lieutenant Governor unable to perform duties of his office by reason of physical or mental disability); Md. Const. Art. 2, § 7 (giving the Legislature the ability to impeach the Governor and Lieutenant Governor); Md. Const. Art. 2, § 24 (mandating that, if the Governor establishes new executive programs, the programs be submitted to the Legislature for approval); Md. Const. Art. 3, § 30 (requiring presentment of all legislative bills to the Governor); Md. Const. Art. 4, § 3 (granting the Legislature the power, with the approval of Governor, to retire a judge who is unable to perform his duties with efficiency due to continued sickness or physical or mental infirmity); Md. Const. Art. 4, § 4 (granting the Legislature the power to remove a judge by impeachment, and the Governor the power to remove a judge for incompetence, wilful neglect of duty, misbehavior in office, or other crime); Md. Const. Art. 4, § 5A (delegating the authority to appoint a person to fill vacancy on an appellate court until election to the Governor, upon the advice and consent of the Senate,); Md. Const. Art. 4, § 41D (delegating the authority to the Governor to, upon advice and consent of the Senate, appoint District Court judges).

The system of checks and balances which fits tongue and groove with the notion of separation of powers of the legislative and executive bodies complimented the colonial experience, as recognized by Professor Carpenter in his treatise, *The Development of American Political Thought*, when he stated:

> Across the black morass of English political corruption the principles of Montesquieu loomed to American statesmen all the more vividly. The doctrine of the separation of powers and the system of checks and balances appeared not only correct as theories but also fitted in with colonial experience.

William Seal Carpenter, *The Development of American Political Thought* 51 (1930), and also by William Penn, the founding father of Pennsylvania, who observed that:

> It ha[d] always been the favorite maxim of princes, to *divide* the people, in order to *govern* them; it is now time that the people should avail themselves of the same maxim, and *divide* power among their rulers, in order to prevent their abusing it.

William Penn, No. 2 (Jan. 3, 1788), *reprinted in* 1 *The Founder's Constitution* 324 (Philip B. Kurland & Ralph Lefner eds., 1987).

Thus, many of the colonists campaigned for the incorporation of the doctrine of separation of powers and its auxiliary system of checks and balances into the new Maryland government, as reflected in the "militia resolves" of the Freemen of Anne Arundel County published in the Maryland Gazette in July of 1776, just four months before the adoption of the Maryland Declaration of Rights:

> It is essential to liberty, that the Legislative, Judicial, and Executive powers of Government be separate from each other; for where they are united in the same person, or number of persons, *there would be wanting that mutual check which is in the principal security against their making of arbitrary laws, and a wanton exercise of power in the execution of them.*

Bruce Worthing, Letter to Charles Carroll, Barrister, Samuel Chase, Thomas Johnson, William Paca, and Charles Carroll, Esquire, Delegates in Convention for Anne Arundel County, The Maryland Gazette, July 18, 1776 (emphasis added). The separation of powers and checks and balances are now the foundation of Maryland's government. *See* Bergman, *supra,* at 25 ("[T]he separation of powers principle had been central to the establishment of the governments of Virginia, Maryland, and North Carolina. Combined *with a doctrine of checks and balances,* it had become a staple of the American political creed.") (emphasis added).

It is within this historical context that we must address the gravamen of this case; whether Maryland's system of separation of powers and checks and balances provides the Executive branch with the *inherent* power to select and remove civil officers serving in legislatively-created offices. It does not. Chief Judge Robert Murphy, writing for this Court in *Commission on Medical Discipline v. Stillman,* 291 Md. 390, 435 A.2d 747 (1981), clearly and definitively differentiated the gubernatorial power to execute the law, which is an inherent executive function, from the power of appointment, which is not an intrinsic executive function:

> In answer to the contention that the power of appointment was 'an intrinsic executive function,' beyond the legislature's authority, the Court observed: 'The Legislature makes the laws, the Judiciary expounds them, and the Governor sees that they are faithfully executed. . . . It does not follow, as a necessary conclusion, that, in order to perform this duty, the Governor must have agents of his own nomination. Our form of government, in its various changes, *has never recognized this power as an executive prerogative.*

*Id.* at 409–10, 435 A.2d at 757 (emphasis added). In recognizing this differentiation, Chief Judge Murphy, writing for a unanimous court, relied on over two-hundred years of precedent.

The first discussion of the legislative authority to appoint officers as embraced in Article II of the Constitution, within

the context of the Declaration of Rights, occurred in *Davis v. State*, 7 Md. 151 (1854). In that case, our predecessors considered the constitutionality of a law abrogating the power of the Governor to appoint an inspector of bark [6] and rejected the Petitioner's argument that the act was an encroachment by the Legislature on the Executive's power to appoint. We explained that Section 11, Article II [7] does not reserve the power to appoint civil officers exclusively for the Governor, but instead

> means, simply, that the Governor shall have the power to fill all offices in the State, whether created by the Constitution or by Act of Assembly, *unless otherwise provided by the one or the other.*

*Id.* at 161 (emphasis added). Thus, when the Legislature has delegated the power of appointment to the Governor, the Legislature can remove that power to appoint. Hence, because the office of the inspector of the bark was a legislatively-created office:

> [*I]t can be modified, controlled or abolished,* and within these general powers is embraced the right to change the mode of the appointment to the office. We have only to add, that as the legislature has the power to withdraw the authority to appoint from the Governor, the mode pointed out by the Act of 1854, by which inspectors under that Act are to be designated and qualified, was a constitutional exercise of the legislative power.

*Id.* at 161 (emphasis added).

In *Baltimore v. State, supra,* one of the most cited cases in our jurisprudence,[8] this Court squarely addressed an alleged

---

**6.** The inspector of bark was authorized to inspect ground black-oak bark, which was intended for exportation at the Port of Baltimore. 1821 Md. Laws. Chap. 77.

**7.** This provision of the Constitution was moved in 1867 to Article 2, Section 10 of the Maryland Constitution. Md. Const. Art. 2, § 10 (1867).

**8.** *See, e.g., Benson v. State,* 389 Md. 615, 642, 887 A.2d 525, 540 (2005); *Prince George's County v. Aluisi,* 354 Md. 422, 432, 439, 731 A.2d 888,

conflict between the power of the Executive branch to appoint civil officers and the power of the Legislature to control the offices which it had created. In *Baltimore*, the General Assembly had repealed all laws regarding the Baltimore City police force and enacted new legislation vesting the power to recreate and maintain the police force in a newly created commission, reserving to itself the power to appoint the commissioners. The Mayor and City Council objected and alleged that the Act was an encroachment by the Legislature on the Executive's power to appoint the commissioners and therefore a violation of the Declaration of Rights' mandatory separation of powers.

In addressing this argument, we clearly opined that the power of appointment is not inherently an executive function:

We are not prepared to admit that the power of appointment to office is a function *intrinsically executive*, in the sense in which we understand the position to have been taken; namely, that it is *inherent in, and necessarily belongs to, the executive department.*

*Baltimore*, 15 Md. at 455 (emphasis added). To the contrary, we stated that:

[I]t is no where intimated that another department, than the executive, cannot exercise the power.... And, indeed, here it is admitted, that the executive cannot act where other modes of appointment are prescribed by the Constitution. It is true that certain powers are peculiar to each department, as their designations import the Legislature makes the laws, the Judiciary expounds them, and the Governor sees that they are faithfully executed; *but even in this duty*

894, 898 (1999); *McCulloch v. Glendening*, 347 Md. 272, 284, 701 A.2d 99, 104 (1997); *Workers' Comp. Comm'n v. Driver*, 336 Md. 105, 118, 647 A.2d 96, 103 (1994); *Harford County v. Univ. of Maryland Medical System Corp.*, 318 Md. 525, 528, 569 A.2d 649, 651 (1990); *State v. Smith*, 305 Md. 489, 511–12, 505 A.2d 511, 522 (1986); *Murphy v. Yates*, 276 Md. 475, 491, 348 A.2d 837, 846 (1975); *Johnson v. Luers*, 129 Md. 521, 530, 99 A. 710, 713 (1916); *Beasley v. Ridout*, 94 Md. 641, 647, 648, 650, 654, 656, 657, 658, 660, 52 A. 61, 62, 64, 65 (1902); *Jackson v. State*, 87 Md. 191, 194, 39 A. 504, 505 (1898).

*he is restrained in some degree,* because they must be enforced according to the Constitution and laws, and not at his will and discretion. It does not follow, as a necessary conclusion, that, in order to perform this duty, he must have agents of his own nomination. Our form of government, in its various changes, has never recognized this power as an executive prerogative.

*Id.* at 456 (citations omitted). Thus, we explicated that the Legislature, in creating a new commission to administer the Baltimore City police force, retained the ability to pass legislation affecting the appointment of the commissioners:

[t]he Constitution surely designed to repose some discretion in the Legislature, both over the mode of appointment, and the *propriety and necessity of passing any law on the subject* to which the exercise of the power might relate.

*Id.* at 460. Clearly, we recognized this legislative prerogative as a "check[ ] upon the improper exercise of the appointing power if left in the hands of the Governor alone," *id.* at 459 (emphasis added), because the power to appoint commissioners "belongs where the people choose to place it," *id.* at 457, and because "such power had been exercised by the Legislature, from the earliest period of the government."[9] *Id.* at 461.

---

**9.** In the concurring opinion, Chief Judge Le Grande, acknowledged that the legislative prerogative to appoint had its origins in Montesquieu:

The Constitution and laws fix the boundaries within which their ministers must act. All action outside is forbidden as usurpation, and, therefore, tyranny. In all governments, having any just pretensions to be considered free, limits are established to authority, of whatever character it may be. 'There can be no liberty,' says Montesquieu, 'where the legislative and executive powers are united in the same person or body of magistrates,' or 'of the power of judging be not separated from the legislative and executive powers.' The meaning of this, says Mr. Madison, is not that 'these departments ought to have no *partial* agency, or no *control* over the acts of each other,' but amounts to this: 'That where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free Constitution are subverted.' But of this more hereafter. Suffice it for the present, that in the true sense of Montesquieu, in this, as in each of the other States of the confederacy, the powers of government have been parceled out to be exerted by separate and distinct departments....

Since *Baltimore*, this Court consistently has iterated that the Executive does not have the inherent power of appointment and, most importantly, that the Legislature has the power to abolish, modify and control any office that it has created. In *Stillman, supra,* a case which the majority addresses peripherally, we answered the question of whether the Legislature's delegation of the power to appoint commissioners serving on the Commission on Medical Discipline to a private organization, violated the gubernatorial power provisions of the Constitution and the separation of powers doctrine in the Declaration of Rights. Chief Judge Murphy, writing for this Court, summarized this Court's jurisprudence and succinctly and clearly articulated that the power of appointment is *not* an intrinsic executive function, but rather, that the Legislature can *modify, control,* and *abolish* any office it has created:

> [This question] was considered by the Court in *Davis v. State,* 7 Md. 151 (1854), and *Baltimore v. State,* 15 Md. 376 (1860). In *Davis,* the question was whether, under this constitutional provision, the legislature could provide for appointment to an office created by statute. [We] [c]onclud[ed] that it could....
>
> \* \* \*
>
> In *Baltimore,* the Court reconciled the interpretation in *Davis* with the separation of powers provision contained in

---

Neither of the departments is absolutely sovereign in all things, but is only so within its proper limits. According to the theory on which our State government is founded, the people are recognized as the source of all governmental power. They are, in this sense, the true and only sovereigns. For their own good, they have authorized a body, chosen by themselves, to exercise, under certain prescribed limitations, the supreme power. *This body is known, in common parlance, as the Legislature, and, except in cases prohibited, either by the Constitution of the United States or that of the State, is as free and competent to act in the passage of binding and effective laws as would be the people themselves,* if they were acting in their primary and sovereign capacity as a pure democracy, restrained only by their sense of justice and expediency.

*Id.* at 471–72 (emphasis added).

the Declaration of Rights. In answer to the contention that the power of appointment was 'an intrinsic executive function,' beyond the legislature's authority, the Court observed: '(T)he Legislature makes the laws, the Judiciary expounds them, and the Governor sees that they are faithfully executed.... It does not follow, as a necessary conclusion, that, in order to perform this duty, the Governor must have agents of his own nomination. Our form of government, in its various changes, has never recognized this power as an executive prerogative.' 15 Md. at 456. The Court in *Baltimore* said that the Constitution 'so far from treating ... the appointment power as an inherent executive power, indicates that it belongs where the people choose to place it.' *Id.* at 457. Addressing the separation of powers question, the Court concluded: 'In considering the question as to separation of the departments, we are to bear in mind that the Declaration of Rights is not to be construed by itself, according to its literal meaning; it and the Constitution compose our form of government, and they must be interpreted as one instrument.... The former announces principles on which the government, about to be established, will be based. If they differ, the Constitution must be taken as a limitation or qualification of the general principle previously declared, according to the subject and the language employed.' *Id.* at 459 (citation omitted in original).

In *Anderson v. Baker*, 23 Md. 531 (1865), the Court considered a provision of the Maryland Constitution of 1864 which was also identical to Art. II, § 10 of our present Constitution. In holding that the legislature could constitutionally provide for appointment to an office created by it, notwithstanding the separation of powers provision of the Declaration of Rights, the Court said: 'The Act in question, creating the office, does prescribe a different mode of appointment. *Where the office is of legislative creation, the Legislature can modify, control or abolish it,* and within these powers is embraced the right to change the mode of appointment.' *Davis v. State*, 7 Md. at 161.'

\* \* \*

In *Scholle v. State*, 90 Md. 729, 46 A. 326 (1900), the Court interpreted Art. II, § 10 of the present Maryland Constitution in accordance with the holding in the *Davis, Baltimore,* and *Baker* cases. It is thus clear that when the legislature creates an office by statute, as it did in § 130(a), the separation of powers provision of Article 8 does not of itself prevent the legislature from placing the power of appointment in the hands of someone other than the Governor. As stated in *Scholle,* when the legislature has created an office by statute, it 'can designate by whom, and in what manner the person who is to fill the office shall be appointed.' 90 Md. at 743, 46 A. 326.

*Stillman,* 291 Md. at 409–411, 435 A.2d at 757–58. *See also Dorf v. Skolnik,* 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977) (stating "that if the General Assembly may abolish an office of its creation, then there is no vested right in an office of other than constitutional stature which would prevent changing the qualifications of office during the term"); *Buchholtz,* 178 Md. at 287, 13 A.2d at 352 (" 'The Governor has no power of appointment except as expressly provided by the Constitution or statute; and if he attempt to make an appointment without such express authority, that appointment would simply be without effect.' ") quoting in turn *Smoot v. Somerville,* 59 Md. 84, 93 (1882); *Riggin v. Lankford,* 134 Md. 146, 153–55, 105 A. 172, 173–74 (1918) (holding that the Governor did not have to obtain the consent of the Senate for the appointment of a candidate when the first candidate had been rejected by the Senate, the Senate was not in session at the time that the second candidate was appointed, and because the Legislature, which created and therefore controlled the office, did not require by statute that the Governor seek the Senate's approval in those circumstances); *McCurdy v. Jessup,* 126 Md. 318, 320–27, 95 A. 37, 38–40 (1915) (holding that the requirement that the county seek recommendations for appointments to a civil office from a private corporation was not constitutionally repugnant because, where the office was created by the Legislature, the Legislature retains the control over that

office's method of appointment); *Purnell v. State Board of Education*, 125 Md. 266, 270, 93 A. 518, 520 (1915) (holding that the Legislature, which created the State Board of Education, has the power to abolish, modify, and control it, and therefore had the power to do away with the prerequisite that the Senate affirm the Governor's appointments of all commissioners serving on the Board); *Ash v. McVey*, 85 Md. 119, 129–31, 36 A. 440, 441–42 (1897) (holding that the Governor had no power to make the appointment of officer of the school commissioner for Cecil County without the consent of the Senate when the office was not vacant because the Legislature, which had created and therefore controlled the office, had not delegated that power to the Governor); *Warfield v. Com'rs of Baltimore County*, 28 Md. 76, 84 (1868) (holding that a law creating a public office and providing for the officer's compensation, mode of payment thereof, and mode of appointment, could be modified or abolished by the Legislature at any time). *Cf. County Comm'rs of Calvert County v. Monnett*, 164 Md. 101, 105–07, 164 A. 155, 156–57 (1933) (holding that the prohibition of Section 35, Article III against the increase or diminution of compensation for public officers applied to the treasurer of Calvert County, and therefore, even though the Legislature retained the power to alter or abolish the office, it could not change the treasurer's salary while in office).

The majority's haste to formulate an opinion which is result-orientated has caused it to overlook the fact that the denial of a temporary restraining order is not appealable, that the PSC members are not "civil officers" for the purposes of Section 15, Article II of the Constitution if they are not vested with a portion of the state's sovereignty to individually act for the public good, and, most importantly, that the gubernatorial powers enumerated in Sections 1, 9 and 15, Article II do not divest the Legislature of its power to create, control, modify, and abolish any office which it has created. To the contrary, this Court has consistently said that the power to appoint and remove civil officers is not inherently executive, not even with respect to the Governor's own appointees, but also may be

exercised by the Legislature if the office itself is a legislative creation. The PSC is an example of such an office, and therefore, the Legislature has the power to regulate fully its Commissioners, a power which includes the ability to fire them. Therefore, I would affirm the judgment of the Circuit Court for Baltimore City.